UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| OCEANUS PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 14-168-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| AGRICULTURAL DEPT., et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Oceanus Perry is an inmate confined by the Bureau of Prisons ("BOP") at the United States Penitentiary ("USP")-McCreary, in Pine Knot, Kentucky. Proceeding without an attorney, Perry has filed a Complaint asserting various tort and constitutional claims under 28 U.S.C. § 1331 pursuant to the doctrine announced in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), against fifty-one defendants.[1] [Record No. 1] The Court granted Perry's motion to proceed *in forma pauperis* by separate order. [Record No. 11]

---

[1]     Perry named the following defendants: (1) Agricultural Department; (2) Department of Justice; (3) United States Attorney General; (4) Bureau of Prisons; (5) National Institute of Corrections; (6) J.C. Holland, Warden, USP-McCreary; (7) Captain Christopher Maruka; (8) Ronald Corriveau, Special Investigative Services ("SIS") Agent; (9) Todd Lambert, Human Resources Manager; (10) Lieutenant Carol, SIS Agent; (11) Lieutenant Leroy Chaney, SIS Agent; (12) Lieutenant Fowler; (13) Lieutenant Huberty; (14) Lieutenant William Duck; (15) David Mullins; (16) Lieutenant Mark Dixon; (17) Lieutenant D. Weiss; (18) Richard Parson; (19) Lieutenant Ultizer; (20) Lieutenant Baker; (21) "Stevens," Health Services Administrator; (22) "B." Barron, Health Services Administrator; (23) "Davis," Physician Assistant; (24) "Baker," Physician Assistant; (25) Nurse Stevens; (26) Nurse Sumer; (27) Pamela Poston, Unit Manager; (28) Mrs. Jameson, Case Manager; (29) Mr. Lawson, Unit Counselor; (30) Shelia L. Mattingly, Mailroom Supervisor; (31) Mr. Vires, Mailroom Employee; (32) Officer Brown, Special Housing Unit ("SHU") Property Officer; (33) Officer R. Thurman, SHU Property Officer; (34) Officer L. Brown; (35) Officer Barnett; (36) Officer D. Gardner; (37) Officer A. Rose; (38) Officer David Taylor; (39) Gary Mehler, Disciplinary Hearing Officer; (40) Richard B. Ives, Former Warden, USP-McCreary; (41) "Dr. Velaspues" or "Dr. Valasquez;" (42) E.M.T. Christopher Griffis; (43) Dr. Lemon, "Psy." Department; (44) Dr. Peterson, "Psy." Department; (45) Dr. Figuroa, "Psy." Department; (46) "H. Quay," Former Associate Warden; (47) Staff, Federal Transit Center ("FTC")-

The Court has conducted a preliminary review of Perry's Complaint because he asserts claims against a government official and because he has been granted pauper status. 28 U.S.C. §§ 1915(e)(2)(B), 1915A.  Because Perry is not represented by an attorney, the Court liberally construes his claims and accepts his factual allegations as true.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).  For the reasons set forth below, certain claims against five defendants[2] may proceed, but the remaining defendants will be dismissed from this action.

## I.

Perry is serving several consecutive terms of imprisonment imposed in separate criminal cases.  On September 2, 2003, in Cleveland, Ohio, Perry was sentenced to a 128-month prison term for armed bank robbery.  *United States v. Oceanus Perry*, No. 4: 02-CR-92-SL-1 (N. D. Ohio 2002) [Record No. 63, therein; *aff'd*, Record No. 77, therein].  On April 11, 2006, in Columbus, Ohio, Perry was sentenced to a 63-month prison term based on his convictions for bank robbery and for the illegal use of firearms.  *United States v. Oceanus Perry*, No. 4:02-R-92-SL-1 (N. D. Ohio 2002) [Record No. 52, therein; *aff'd*, Record No. 73, therein; *see also United States v. Oceanus Perry*, No. 06-3514, 228 F. App'x 557 (6th Cir. April 13, 2007).].

In October 2007, Perry and three other inmates were indicted on several criminal charges in connection with an incident at USP-McCreary on September 17, 2007.  *United*

---

Oklahoma, Oklahoma City, Oklahoma; (48) Lieutenant Daniels; (49) Dr. Kahn; (50) Officer "D." Brush; and (51) Officer "Lessner" and/or "Lesser."

2       Perry has been granted pauper status.  As a result, the United States Marshals Service ("USMS") will be instructed to serve the five defendants with the summons and Complaint on his behalf.  *See* Fed. R. Civ. P. 4(c)(3); 28 U.S.C. § 1915(d).

*States v. Oceanus Perry*, No. 7:07-CR-23-GFVT-EBA (E.D. Ky. 2007); [Record No. 1, therein].

On March 19, 2008, the jury convicted Perry on charges of assaulting a federal law

enforcement officer and aiding and abetting in violation of 18 U.S.C. §§ 2 and 111(a)(1) and

(b), and of being an inmate in possession of a prohibited object under 18 U.S.C. § 1791(a)(1).

[Record No. 205, therein]  Consequently, on September 30, 2008, Perry was sentenced to a

225-month prison term, to be served consecutively to his prior Ohio sentences.  [Record

No. 263, therein]  Perry's conviction and sentence were affirmed on appeal.  [Record No.

291, therein; *see also United States v. Oceanus Perry*, No. 08-6219, 401 F. App'x 56 (6th Cir. Nov.

4, 2010).][3]

## II.

The following is a summary of the allegations set out in Perry's Complaint.[4]

### A. Alleged Events at FTC-Oklahoma in 2011

On November 29, 2011, Perry arrived at the Federal Transfer Center in Oklahoma

City, Oklahoma ("FTC-Oklahoma), but was separated from other intake inmates because

"he was being housed in [the Special Housing Unit ("SHU")] due to a 2007 assault in

Kentucky."  [Record No. 1, p. 11, ¶¶ 84–85]  Perry states that he was "subjected to metal

detectors and X-ray body scans due to suspicion of alleged contraband," that he was placed

---

[3]     The BOP's website indicates that Perry, BOP Register No. 65754-061, has a projected release date of September 7, 2051.  *See* http://www.bop.gov/inmateloc/ (last visited April 14, 2015).

[4]     Perry begins his Complaint by describing events which allegedly occurred at USP-McCreary between June 14 and 30, 2014.  [Record No. 1, pp. 7–11]  Midway through his Complaint, he shifts to describing events which allegedly occurred on November 29, 2011, in the Federal Transfer Center in Oklahoma City, Oklahoma ("FTC-Oklahoma").  [*Id.*, pp. 11–13]  Perry then describes incidents which he alleges occurred at USP-McCreary in early December 2012, and during the years of 2012 and 2013.  [*Id.*, pp. 13–17]  Towards the end of his Complaint, Perry describes incidents which he alleges occurred at USP-McCreary in 2014.  [*Id.*, pp. 17–21]  For clarity, the Court has summarized Perry's factual allegations in chronological order, beginning on November 29, 2011, and continuing through June 2014.

in an observation cell, and forced to wear body restraints.  [*Id.*, ¶¶ 86-91]  When Perry refused to sign a statement and form acknowledging his consent to a "digital and instrument rectal" search, prison officials informed Perry that his consent was not required because the BOP Regional Director had approved the rectal search.  [*Id.*, pp. 11–12, ¶¶ 91–94]  Then, Perry claims, an unidentified prison official grabbed him by the back of the neck, forced him onto the table, and a doctor and other prison officials performed a physical rectal search.  [*Id.*, p. 12, ¶¶ 96–99]  According to Perry, FTC-Oklahoma officials did not attempt less intrusive means to conduct the search.  [*Id.*, ¶ 95]

Perry alleges that the search did not produce any contraband.  [*Id.*, ¶ 100]  Nonetheless, Lieutenant Daniels allegedly stated that the rectal examination "would be repeated until contraband was found."  [*Id.*, ¶ 101]  Perry asserts that Lieutenant Daniels and several other unknown officers then conducted a metal detector and X-ray body scan, which produced negative results.  [*Id.*, pp. 12–13, ¶¶ 104–05]  While Lieutenant Daniels was escorting the restrained Perry back to the observation cell, Lieutenant Daniels struck him in the groin.  Perry further alleges that Officer "Lesser" or "Lessner" and other unidentified prison staff members threatened him, taunted him, and made sexual comments about the rectal search.  [*Id.*, p. 13, ¶¶ 106–07]  Perry also claims that when he returned to the observation cell, he was strip-searched and ordered to submit to a urine analysis.  [*Id.*, ¶ 109]  Perry claims that he was escorted to the SHU, where he requested medical treatment due to excessive rectal bleeding.  [*Id.*, ¶ 110]

**B. Alleged Events at USP-McCreary from December 1, 2011, to February 2012**

Perry contends that, on December 1, 2011, he was returned to USP-McCreary, and that during intake screening, he "gave notice" of the alleged events on November 29, 2011, to Mrs. Read, the Unit 3 Case Manager; Dr. Figuroa; Special Investigative Services ("SIS") Lieutenant Baker; and Operations Lieutenant William Duck.  [Record No. 1, p. 13, ¶ 112] Perry states that he informed EMT Christopher Griffis that he was experiencing "rectal pain, swelling of the testicle, and lower back pain."  [*Id.*, pp. 13–14, ¶¶ 115–16]  Griffis allegedly responded that Physician Assistant Baker, his health care provider, would handle his medical complaints as part of his institutional orientation.  [*Id.*]

Perry claims that SIS Agent Ronald Corriveau interviewed him "near Monday," (presumably, Monday, December 3, 2012), but that Corriveau declined to take his statement because FTC-Oklahoma Lieutenant Daniels had filed a report about the incident on November 29, 2011.  [*Id.*, p. 14, ¶ 119]  Perry contends that, on December 20, 2011, an individual named Henekis Stoddard mailed him a copy of his statement concerning the alleged events of November 29, 2011, but that the USP-McCreary mailroom staff gave the mail to SIS staff, so Perry never received it.  [*Id.*, ¶ 120]

Perry alleges that on December 13, 2011, "Dr. Velaspues"[5] came to his SHU Cell, asked him his BOP Register Number, and walked away, claiming that he had conducted a

---

5        Perry identifies this defendant as either "Dr. Valaspues" and/or "Dr. Velazquez," but he may be referring to Dr. Jorge Vazquez-Velazquez.  The Court takes judicial notice of recent pleadings from other civil actions filed in this district which document that Dr. Jorge Vazquez-Velazquez is the Regional Physician-Clinical Consultant at USP-McCreary.  *See Macleod v. Grajales*, No. 6:13-CV-188-DCR (E. D. Ky. 2013) [Record No. 25-2, therein (Declaration of Dr. Jorge Vazquez-Velazquez)].

"chronic care" consultation.  [*Id.*, ¶ 121][6]  Perry asserts that Physician Assistant Baker did not see him until January 2012.  When he complained to Baker about his medical complications resulting from alleged events of November 29, 2011, Baker responded that she would not treat him because her computer showed no medical report.  [*Id.*, pp. 14–15, ¶¶ 123–24]

Perry also alleges that, on January 11, 2012, while he was confined in the SHU at USP-McCreary, he discovered that several items of his personal property were missing.  The USP-Allenwood staff had inventoried and mailed these personal items to him.  Perry complained to "R & D" Supervisor Sheila Mattingly and filed a tort claim.  The tort claim was denied, according to Perry, because Lieutenant Thornburg lied about the receipt associated with the missing property.  [*Id.*, p. 16, ¶¶ 132–35]

Perry also claims that, in February 2012, UPS-McCreary Warden Richard B. Ives, Associate Warden Quay, Captain Christopher Maruka, and SIS Agent Ronald Corrivuea signed a "correspondence rejection notice," which allegedly stated that he would not be allowed to receive mail because he was a "terrorist and a police assaulter."  [*Id.*, p. 15, ¶¶ 125–27]  Perry states that the BOP's inmate classification scheme does not include "terrorist" and he has not been convicted of crime involving terrorism.  Perry asserts that the inaccurate notice was mailed to several individuals, including Henekis Stoddard, who stopped contacting him as a result.  [*Id.*, ¶¶ 128–29]  Perry alleges that he filed a grievance with Warden Richard B. Ives and USP-McCreary Mailroom Supervisor Sheila Mattingly.  [*Id.*, ¶ 130]  Mattingly purportedly responded that the SIS collected Perry's mail, screened it,

---

6       Perry contends that he did not receive his scheduled quarterly chronic-care consultation until July 2012.  [*Id.*, ¶ 122]

and returned the mail several days later.  The mailroom staff allegedly discards any mail that has a postmark of more than ten days earlier.  [*Id.*, ¶ 131]

### C. Alleged Events at USP-McCreary from June 2012 to August 2012

Perry asserts that Lieutenant Daniels, located at FTC-Oklahoma, issued Incident Report No. 2239424 regarding the alleged events on November 29, 2011.  [Record No. 1, p. 16, ¶ 136]  While somewhat unclear, it appears that Lieutenant Daniels charged Perry with possessing contraband at FTC-Oklahoma.  [*Id.*, ¶ 140]   In June 2012, Gary Mehler, a Disciplinary Hearing Officer ("DHO") at USP-McCreary, presided over the disciplinary hearing.  Perry claims that he produced staff memoranda showing that Incident Report No. 2239424 was "fraudulent."  [*Id.*, ¶¶ 137–39]  However, allegedly acting on instructions from Captain Maruka, DHO Mehler refused to dismiss the Incident Report.  [*Id.*]  Instead, DHO Mehler postponed the hearing, stating that he needed to talk to Captain Maruka about the charge.  [*Id.*]  In early July 2012, Lieutenant Baker served Perry with revised Incident Report No. 2239424 which asserted that FTC-Oklahoma SIS staff, not Lieutenant Daniels, had discovered contraband in a different location.  [*Id.*, ¶ 140]

In August 2012, Perry was found guilty of the offense charged in the revised Incident Report No. 2239424.  On the same day, Captain Maruka released him from the SHU, where he had been confined for nine months.  [*Id.*, ¶ 141]  Perry appears to allege that, as a result of Incident Report No. 2239424, "he was sanctioned which extended the term of his sentence." [*Id.*, p. 19. ¶ 165]  In other words, Perry lost good-time credits ("GTC") as a result of his disciplinary conviction based on the November 29, 2011 incident.

### D. Alleged Events at USP-McCreary in May 2013

Perry further alleges that in late May 2013, SIS Agent Lieutenant Carol and Lieutenant "D." Mullins placed him in the SHU because he refused to provide information on his "associates."  He remained in the SHU from Friday until Tuesday, without receiving a copy of a lock-up authorization, Incident Report, or report from a Segregation Review Officer.  [Record No. 1, p. 17, ¶¶ 142–43]  Perry also claims that when he was sent to the SHU, Officer Barnett and an unknown officer inventoried and packed his personal property.  Perry claims that, after he was released from the SHU, he noticed that several items of property were "missing" from the inventory list and that Officer Barnett had those items in his possession.  [Id., ¶¶ 144–46]  Perry notified former Warden J. C. Holland, who instructed Lieutenant Huberty to investigate, but no investigation was conducted.  [Id., ¶ 147]

### E. Alleged Events at USP-McCreary between January 13, 2014, and February 5, 2014

Perry also claims that on January 13, 2014, Officer David Taylor searched Perry's cell (No. 209 in Unit 6A).  An officer informed Perry that "Taylor said he found a piece of metal in the light."  [Record No. 1, p. 17, ¶¶ 148–49]   Perry and his cellmate were called to the office of Lieutenant "D." Mullins, who informed them that contraband metal was found in the light in the cell.  Perry and his cellmate were then taken to the SHU.  [Id., ¶¶ 150–51]  On January 14, 2014, Lieutenant Mark Dixon served Perry with Incident Report No. 2530713, charging him with attempting to manufacture a weapon based on the discovery of metal inside a shoe.  [Id., p. 18, ¶¶ 152, 154]   The disciplinary process was suspended, however, pending a referral of the charge to the Federal Bureau of Investigations ("FBI").  [Id., ¶ 152]  Perry asserts that the Incident Report did not describe the shoe in which the metal piece was

allegedly found.  [*Id.* ¶ 154]  Perry alleged, in a Notice to the Warden, that Officer Taylor had planted evidence, falsified the Incident Report, and was responsible for the loss of his personal property.  [*Id.*, ¶ 153]

Perry states that on January 22, 2014, Lieutenant Richard Parsons informed Perry that Warden J.C. Holland had authorized him to seize all of Perry's personal property, including paper and pens, because Perry was attempting to file a "private administrative remedy."  [*Id.*, ¶ 155–56]  Perry claims that, on that same date, he requested "copies of the institutional referral document and the FBI rejection notice."  [*Id.*]

On January 27, 2014, the Unit Disciplinary Committee ("UDC") conducted a hearing on the charge set forth in Incident Report No. 2530713.  Perry requested that the UDC dismiss the Incident Report due to noncompliance with UDC procedures.  [*Id.*, ¶ 157]  And when the matter was not dismissed, he asked Unit 4A Case Manager "B." Chitwood to review the camera from Unit 6A to prove that (1) Officer David Taylor had engaged in improper conduct while searching his cell on January 13, 2014, and (2) Taylor "never called staff to witness the object allegedly found and where it was allegedly found."  [*Id.*, pp. 18–19, ¶ 158]

On February 3, 2105, Perry mailed a certified letter to Warden Holland allegedly providing  evidence in support of his claims against Officer David Taylor, "and an institutional appeal."  [*Id.*, p. 19, ¶ 159]  Perry was told that his certified mailing was lost; however, on February 6, 2014 (the day after his disciplinary hearing), USP-McCreary mailroom official "Vires" claimed that the letter had "popped up" on her desk.  [*Id.*, ¶ 162]

On February 5, 2014, DHO Gary Mehler found Perry guilty of the offense charged in on Incident Report No. 2530713.  [*Id.*, ¶ 161]   Perry challenges the finding, claiming that no photographic evidence of the shoe in question existed.  He also alleges that DHO Mehler lied "when he stated that inmates did not request camera review because footage had been destroyed before the hearing" and "when he said he possessed a copy [of] F.B.I. and rejection documents."  [*Id.*, ¶ 164]   Perry again provides no specifics about the sanction(s) imposed, but states, "[s]imilar to being found guilty to incident report 2239424, when Inmate Perry was found guilty of incident report 2530713, he was sanctioned which extended the term of his incarceration."  [*Id.*, ¶ 165]   Thus, Perry apparently lost an unspecified amount of GTC as part of his penalty.  Perry appealed his conviction on Incident Report No. 2530713, based on the lack of referral documents from the FBI, but claims that his "regional appeal" was denied on May 1, 2014.  [*Id.*, pp. 19–20]   Perry contends that "an unofficial USP-McCreary F.B.I. referral document" was created on May 17, 2014.  [*Id.*]   Perry does not indicate whether he appealed the regional office's decision to the BOP Central Office.

## F.  Alleged Events at USP-McCreary between April 26, 2014, and May 1, 2014

Perry also claims that, on April 26, 2014, Officer "A." Rose improperly seized items of his personal property without a "confiscation form."  When Perry asked the reason for the confiscation, Rose allegedly stated, "the next time I catch you in your cell, I'm going to say that you assaulted me.  You are lucky I don't kick you're a _ _ and shove a plunger up you're a_ _."  [Record No. 1, p. 20, ¶¶ 168–69]   Perry states that, on April 29, 2014, he submitted a "complaint with an affidavit" describing Rose's alleged actions, but that Unit 6 Manger Pamela Poston refused to process it.  [*Id.*, ¶ 170]   Perry further asserts that, on May

1, 2014, he attempted to use a computer to submit a complaint to SIA Agent Ronald Corriveau, and that at 1:30 p.m. on the same day, Lieutenant Leroy Chaney called him to his office and told him that if he did not drop the complaint, he would be moved to a different housing unit. [*Id.*, ¶¶ 170–73] Perry states that when he refused to drop the complaint, he was "locked" in a holding cell until 6:00 p.m. At that time, Lieutenant "D." Weiss told him that he was being moved to housing Unit 1B. [*Id.*, ¶ 174] When Perry asked why he was being moved to the unit "known to be hostile to inmates from his [Perry's] state," Weiss allegedly replied, "I'll let the inmates handle our problem for us." [*Id.*, p. 21, ¶¶ 175–76] Perry claims that he filed "a complaint of reprisal" to the Warden, the Attorney General, and the BOP's Central office. [*Id.*, ¶ 178]

### G. Alleged Events at USP-McCreary between June 27, 2014, and July 4, 2014

Perry contends that, on June 27, 2014, Officer David Taylor, along with another prison officer, instructed him to exit his cell (No. 120 in Unit 1B) so that Taylor could search it. [Record No. 1, p. 7, ¶¶ 48–51] Perry alleges that he told the other officer that he had filed a complaint alleging that Taylor had planted a piece of metal in his prior cell (No. 209, in Unit 6A). [*Id.*, ¶ 53] Because he had already filed a complaint against Taylor, Perry wanted to observe Taylor during the search, but the other officer refused. [*Id.*, pp. 7-8, ¶¶ 53–54] Perry states that compound officers "pat-searched" him outside of the housing unit. When Perry again explained why he wanted to observe the search, Lieutenant David Mullins told Perry that he would not be filing any complaints and Perry was placed in a holding cell. [*Id.*, p. 8, ¶¶ 55–58] While in the holding cell, Perry was ordered to strip-search in front of

-11-

Lieutenant Mullins and Lieutenant Fowler.  Lieutenant Fowler later stated that he saw an object on the bench behind Perry.  [*Id.*, ¶¶ 60–61]

While Perry was naked, another officer, possibly "J." Wagner, told him to "turn around.  Keep your legs straight.  Bend over at the waist and spread your butcheeks (sic) until I can see in you're a _ _ h_ _ _."  [*Id.*, ¶ 62]  Perry claims that he told the officer he would spread his legs, squat, and then cough pursuant to BOP policy, but that what the officer demanded was sexual harassment.  [*Id.*, ¶ 63]  Perry states he spread his legs, squatted and coughed, but was given his clothes and told that he would be taken to the SHU for refusing a direct order.  [*Id.*, p. 9, ¶¶ 64–67]  An unidentified officer allegedly stated, "now you are going to get you're a_ _ kicked!"  [*Id.*]

At that point Lieutenant Ulitzer and another unidentified officer allegedly assaulted Perry.  Perry was placed in the "black holding cage," strip-searched, and again ordered to submit to a rectal search.  Lieutenant Ulitzer said, "but this time keep your legs straight, turn around, bend over and spread you're a _ _ cheeks until I can see up in you're a _ _."  [*Id.*, ¶¶ 69–70]  Perry allegedly told Lieutenant Ulitzer that his demand violated BOP policy, but Ulitzer told him that if he did not comply, he would instruct the Cell Extraction Removal Team ("CERT") to place him in restraints and "look in his rectum."  [*Id.*, ¶¶ 71–72]

Perry states that "a CERT team was executed against him."  [*Id.*, ¶ 73]  The specifics of the CERT are not alleged in the Complaint.  Perry alleges that he complained to Nurse Sumer that the restraints were cutting off his circulation and breathing.  [*Id.*, ¶ 74]  Perry claims that Lieutenant Ulitzer again verbally threatened him and that Lieutenant Huberty

allegedly told him that "if you stand and spread your cheeks, I'll take you off restraints." [*Id.*, pp. 9–10, ¶¶ 75–76]

On June 28, 2014, Lieutenant Huberty, Physician Assistant Davis, Nurse Stevens, Lieutenant Fowler and Nurse Sumer came into Perry's cell at intervals to check his restraints. He alleges that he complained to each of them about pain and loss of circulation in his wrists, but Lieutenant Fowler and Nurse Sumer refused to provide him with medical treatment or provide a medical request form. [*Id.*, ¶¶ 77–81] Perry was taken to "R & D," where he underwent an X-ray body scan. Perry was allegedly told that submitting to the body scan was "the only way" that he could receive medical treatment. [*Id.*, ¶ 79] However, even after the body scan and his release from the restraints, he claims that he never received medical treatment. [*Id.*, ¶ 79] On June 30, 2014, Perry asked Counselor Lawson and Case Manager Jameson for permission to review the surveillance footage of the events of June 27, 2014. [*Id.*, p. 11, ¶ 82] Perry alleges that between June 27, 2014, and July 4, 2014, Lieutenant Ultizer, Lieutenant Fowler, Lieutenant "R." Parsons, and "unknown SHU staff" denied him toilet paper, hygiene supplies, a shower, and a change of clothing. [*Id.*, ¶ 83]

## III.

### A.  Events Allegedly Occurring at FTC-Oklahoma

Perry claims that Defendants "FTC-Oklahoma staff," FTC-Oklahoma Lieutenant Daniels, FTC-Oklahoma physician Dr. Kahn, FTC-Oklahoma Officer "D." Brush, and an FTC-Oklahoma Correctional Officer identified as "Lessner" and/or "Lesser" violated his rights guaranteed by the Eighth Amendment of the United States Constitution and

committed various common law torts.  Perry cannot pursue such claims in this *Bivens* action and his claims against these defendants will be dismissed for lack of jurisdiction.

A plaintiff must plead facts establishing personal jurisdiction over the defendants he names, and the plaintiff has the burden of making at least a prima facie showing of personal jurisdiction.  *See Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 149 (6th Cir. 1997).  "Without personal jurisdiction over an individual . . . a court lacks all jurisdiction to adjudicate that party's right, whether or not the court has valid subject matter jurisdiction."  *Friedman v. Estate of Presser*, 929 F.2d 1151, 1156 (6th Cir. 1991) (citing *Dragor Shipping Corp. v. Union Tank Car Co.*, 378 F.2d 241, 244 (9th Cir. 1967)).  A defendant must have purposefully established minimum contacts within the forum state before personal jurisdiction will be found to be reasonable and fair.  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–19 (1945); *see also Halderman v. Sanderson Forklifts Co.*, 818 S.W.2d 270, 274 (Ky. Ct. App. 1991).  To establish minimum contacts, a plaintiff must establish that the defendant should reasonably anticipate being brought into court in the forum state because he purposefully availed himself of the privilege of conducting activities there.  *Int'l Shoe*, 326 U.S. at 316–19; *see also Southern Machine Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 380 (6th Cir. 1968).  Put another way, "the relevant inquiry is whether the facts of the case demonstrate that the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'"  *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991) (citations omitted).

Perry has not established personal jurisdiction over any of the FTC-Oklahoma Defendants, all of whom reside and work in Oklahoma.  Perry's claims against them arise

-14-

out of conduct occurring in Oklahoma, not from any alleged activities in Kentucky. Perry does not claim that these defendants have been to Kentucky, or that that they would anticipate being named in litigation here. Accordingly, Perry's official and individual capacity claims against the "FTC-Oklahoma staff," FTC-Oklahoma Lieutenant Daniels, FTC-Oklahoma physician Dr. Kahn, FTC-Oklahoma Officer "D." Brush, and FTC-Oklahoma Correctional Officer "Lessner" and/or "Lesser" will be dismissed for lack of personal jurisdiction. *Hasan v. Waxxis Inv. N.V.*, 865 F.2d 258, at *1 (6th Cir. 1988) (unpublished table opinion) ("[T]he plaintiff in a civil action has the duty to state the grounds upon which the jurisdiction of the court depends."); Fed. R. Civ. P. 8(a)(1); *Walls v. Waste Res. Corp.*, 761 F.2d 311, 317 (6th Cir. 1985).

## B. Alleged Events at USP-McCreary between December 1, 2011, and February 2012

As summarized above, Perry alleges that between June 2012 and August 2012, Dr. Figueroa, Lieutenant Duck, EMT Specialist Christopher Griffis, SIS Agent Ronald Corriveau, "Dr. Velazpues" (or "Dr. Velazquez"), Physician Assistant Baker, Former Warden Richard B. Ives, Former Associate Warden Quay, Captain Christopher Maruka, and Mailroom Supervisor Sheila Mattingly, either interfered with his incoming and/or outgoing mail at USP-McCreary in violation of his rights guaranteed by the First Amendment of the United States Constitution, or denied him necessary medical treatment in violation of the Eighth Amendment, which prohibits cruel and unusual punishment. Perry also claims that these defendants committed various common law torts and seeks monetary damages.

These claims will be dismissed because they are barred by the applicable one-year statute of limitations. A district court may raise a limitations bar *sua sponte* when the "defect

was obvious from the face of the complaint." *Alston v. Tenn. Dep't of Corr.*, 28 F. App'x 475, 476 (6th Cir. 2002) (citing *Pino v. Ryan*, 49 F.3d 51, 53-54 (2d Cir. 1995)).  Perry's First and Eighth Amendment *Bivens* claims arose in Kentucky, and a one-year limitation period applies to claims alleging the commission of constitutional torts in Kentucky.  Ky. Rev. Stat. § 413.140(1)(a); *Mitchell v. Chapman*, 343 F.3d 811, 825 (6th Cir. 2003) (citing *McSurely v. Hutchison,* 823 F.2d 1002 (6th Cir. 1987)); *Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 181–82 (6th Cir. 1990).  Thus, *Bivens* claims, such as these, are subject to a one-year statute of limitations under Kentucky law.  *Mitchell*, 343 F.3d at 825.  When that one-year period began to run is determined by federal law.  *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996) (citing *Sevier v. Turner*, 742 F.2d 262, 272 (6th Cir. 1984)).  A cause of action accrues when "the plaintiff knows or has reason to know that the act providing the basis of his or her injury has occurred."  *Id.* (citing *Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir. 1991)); *see also Fox v. DeSoto*, 489 F.3d 227, 232–33 (6th Cir. 2007).

Perry alleges that his First Amendment mail interference claims and his Eighth Amendment medical treatment claims arose on various dates between December 1, 2011, and an unidentified date in February 2012.[7]  The BOP's administrative remedy process typically takes no more than ninety (90) days from beginning to end but, even assuming that liberal time extensions were involved at all three levels (the institution, the BOP's Regional Office and the BOP's Central Office), and that the process instead extended to hundred eighty (180) days, the administrative remedy process regarding all of Perry's First and Eighth

---

[7]     Perry did not identify specific dates relative to his February 2012 claims, but that the last day of that month was Wednesday, February 29, 2012.  The Court, therefore, liberally assumes that Perry's February 2012 claims could have arisen as late as Wednesday, February 29, 2012.

Amendment claims would and should have concluded before August 31, 2012. That means that Perry should have filed suit on all of these claims on or before August 31, 2013. This action was filed on July 16, 2014, almost one year later.

It is clear from the face of Perry's Complaint that his First and Eighth Amendment claims are barred by Kentucky's one-year statute of limitations. The Court will therefore dismiss Perry's First and Eighth Amendment claims against Dr. Figueroa, Lieutenant Duck, EMT Specialist Christopher Griffis, SIS Agent Ronald Corriveau, "Dr. Velazpues" (or "Dr. Velazquez"), Physician Assistant Baker, Former Warden Richard B. Ives, Former Associate Warden Quay, Captain Christopher Maruka, and Mailroom Supervisor Sheila Mattingly, which arose between December 1, 2011, and February 29, 2012, as barred by the statute of limitations.

### C. Alleged events at USP-McCreary between June 2012 and August 2012; and between January 2013 and February 4, 2014[8]

Perry also claims that between June 2012 and August 2012, DHO Gary Mehler of USP-McCreary, Captain Maruka of USP-McCreary, and Lieutenant Baker of USP-McCreary, violated his right to due process of law guaranteed by the Fifth Amendment of the United States Constitution in connection with Incident Report No. 2239424 (charging him with contraband offenses), and the related disciplinary hearing at USP-McCreary in August 2012. Perry claims that, as a result of the defendants' actions during the disciplinary process, he lost an unidentified amount of GTC which has extended his prison sentence. He seeks monetary damages as a consequence.

---

8       These claims are similar so they will be addressed out of chronological order.

Perry further alleges that between January 2013 and February 5, 2014, Officer David Taylor, Lieutenant "D." Mullins, Lieutenant Mark Dixon, Lieutenant Richard Parsons, Warden J. C. Holland, DHO Gary Mehler, and Mr. "Vires" (USP-McCreary Mailroom official) violated his right to due process of law guaranteed by the Fifth Amendment of the United States Constitution in connection with Incident Report No. 2530713 (charging him with attempting to manufacture a weapon), and the resulting disciplinary hearing which transpired on February 5, 2014. Perry also seeks monetary damages from these defendants.

To the extent that Perry seeks damages or other forms of relief resulting from the loss of his GTC regarding both Incident Reports, his claims will be dismissed without prejudice as premature. Perry admits that he was convicted of the contraband offense as charged in Incident Report No. 2239424, and the attempted weapon offense charged Incident Report No. 2530713. He alleges that he lost an unspecified amount of GTC as a result of both disciplinary convictions. Perry cannot, however, seek damages under *Bivens* unless and until he can demonstrate a favorable termination of his two disciplinary convictions.

In *Heck v. Humphrey*, the Supreme Court established the so-called "favorable termination rule." 512 U.S. 477 (1994). Any claim for damages that, if successful, would "necessarily imply" the "invalidity of any outstanding criminal judgment against the plaintiff" is not cognizable under § 1983 unless the plaintiff demonstrates that judgment's prior invalidation. *Id.* at 487. This rule promotes the finality of, and consistency with, judicial resolutions by limiting opportunities for collateral attack and averting the "creation of two conflicting resolutions arising out of the same or identical transaction." *Id.* at 484. The

-18-

"favorable termination rule" extends to prison disciplinary hearings resulting in the deprivation of GTC, where the prisoner's civil rights action alleging the denial of his due process rights would "necessarily imply" the invalidity of the deprivation of GTC. *Edwards v. Balisok*, 520 U.S. 641, 646–68 (1997). Because the sanctions imposed as a result of Perry's two disciplinary convictions included the forfeiture of GTC, he has placed the duration of his current prison sentence at issue. Perry claims that both charges were factually unfounded and that the defendants involved in both of his disciplinary proceedings (and/or administrative appeals) violated his right to due process of law in violation of his Fifth Amendment rights. If Perry were to succeed on those due process claims in this *Bivens* action, he would necessarily invalidate USP-McCreary's two disciplinary determinations.

A prisoner found guilty in a prison disciplinary hearing cannot use either 42 U.S.C. § 1983 or *Bivens* to collaterally attack the hearing's validity or the conduct underlying the disciplinary conviction. *See Lanier v. Bryant*, 332 F.3d 999, 1005 (6th Cir. 2003) (extending *Heck* to *Bivens* claims); *Johnston v. Sanders*, 86 F. App'x 909, 910 (6th Cir. 2004) ("[Petitioner] cannot challenge a disciplinary proceeding resulting in a loss of good-time credits in a *Bivens* action [when] his disciplinary conviction has not been reversed."); *Denham v. Shroad*, 56 F. App'x 692, 693 (6th Cir. 2003). Because the loss of GTC directly affects the duration of the Perry's prison sentence, Perry must demonstrate a "favorable determination" of his prison disciplinary convictions. To establish a favorable termination, Perry must first successfully challenge the validity of his disciplinary conviction through 28 US.C. § 2241. Perry asserts no facts indicating that he has challenged either disciplinary conviction in a habeas proceeding, and the Court has not located any record of such proceedings in either

-19-

CM/ECF or PACER, the federal judiciary's on-line database. Before filing a writ under 28 U.S.C. § 2241, however, Perry must administratively exhaust his claims directly challenging these disciplinary convictions within the BOP's administrative remedy process. *See Campbell v. Barron*, 87 F. App'x 577 (6th Cir. 2004). The Court takes no position regarding whether Perry has exhausted the administrative remedies available for appealing these disciplinary convictions. If, and only if, Perry's disciplinary convictions are invalidated may he then bring a civil action for the alleged harm caused by the facts which resulted in his disciplinary convictions and sanctions.

Perry's *Bivens* claims against DHO Gary Mehler, Captain Maruka, and Lieutenant Baker, Officer David Taylor, Lieutenant "D." Mullins, Lieutenant Mark Dixon, Lieutenant Richard Parsons, Warden J. C. Holland, and Mr. "Vires" (USP-McCreary Mailroom official) challenging the loss of his GTC will be dismissed without prejudice to his filing petitions for a writ of habeas corpus under 28 U.S.C. § 2241, and obtaining a favorable termination of his disciplinary convictions.

### D. Alleged Events at USP-McCreary in May 2013

Perry claims that in late May, 2013, SIS Agent Lieutenant Carol and Lieutenant "D." Mullins placed him in the SHU from Friday until Tuesday without giving adequate notice and without following proper procedures. [Record No. 1, p. 17, ¶¶ 142–43] Perry alleges that, after his release from the SHU, he realized some of his personal property was missing from the inventory list completed by Officer Barnett and an unknown officer, and that Officer Barnett had some of those items in his possession. [*Id.*, ¶¶ 144–46] Perry alleges

that he "notified" former Warden J. C. Holland who instructed Lieutenant Huberty to investigate, but Lieutenant Huberty failed to investigate his claim.  [*Id.*, ¶ 147]

### 1.      Placement in the SHU

Perry's allegations about his placement in the SHU, from Friday until Tuesday, fail to state a claim for relief under the Eighth Amendment.  *Merchant v. Hawk-Sawyer*, 37 F. App'x 143, 145–46 (6th Cir. 2002) (denying petitioner's Eighth Amendment claim in the absence of allegations that petitioner was "denied basic human needs or otherwise subjected to cruel and unusual punishment.").  Perry does not allege that he lost any GTC connected with his four-day stay in the SHU, and a short-term confinement in SHU does not rise to the level of an atypical and significant hardship in relation to the ordinary incidents of prison life, which is the standard for determining whether a period of confinement in segregation violates his right to due process.  *Sandin v. Conner*, 515 U.S. 472, 484–86 (1995); *Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997); *Wilson v. Wellman*, 238 F.3d 426, at *3 (6th Cir. Dec. 6, 2000) (unpublished table opinion); *Ford v. Harvey*, 106 F. App'x 397 (6th Cir. 2004) (finding that prisoner's placement in disciplinary confinement did not implicate a liberty interest entitled to due process protection, where it was neither accompanied by loss of good time credits nor lasted for a significant period of time causing an unusual hardship on prisoner).  Thus, Perry's claims against Lieutenant Carol, SIS Agent, and Lieutenant "D." Mullins regarding these issues will be dismissed.

### 2.   Claims regarding Lost Property

Perry's complaints about the alleged mishandling, confiscation and/or conversion of his personal property by Officer Barnett fall under the Federal Tort Claims Act ("FTCA"),

28 U.S.C. §§ 1346(b), 2671–80, which provides a limited waiver of sovereign immunity allowing an action against the United States for wrongful acts committed by its employees during the course of their employment.  *See Fitch v. United States*, 513 F.2d 1013, 1015 (6th Cir. 1975); *United States v. Orleans*, 425 U.S. 807, 813 (1975).  The FTCA is the exclusive remedy for such acts or omissions.  28 U.S.C. § 2679.  Even so, Perry's construed FTCA claim will be dismissed because of the detention of goods exception, 28 U.S.C. § 2680(c). This exception to the FTCA bars "any claim arising in respect of . . . the detention of any goods, merchandise, or other property by any . . . law enforcement officer."  28 U.S.C. § 2680(c).  In *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218 (2008), the Supreme Court specifically determined that a "law enforcement officer" includes a BOP official and held that a BOP officer holding prisoner property is exempt from liability upon any loss or destruction of that property.  Because Perry's claims for damages based upon the loss or conversion of personal property are barred by the FTCA exception found at 28 U.S.C. 2680(c), this Court lacks subject matter jurisdiction over his claim against Officer Barnett and will must dismiss it.  *See Alford v. Sadowski*, No. 4:10-CV-2542, 2011 WL 665444, at *1 (N. D. Ohio Feb. 15, 2011), *Smith v. United States*, No. 6:09-CV-314-GFVT, 2010 WL 307942, at *4 (E. D. Ky. Jan. 27, 2010); *Jones v. United States*, No. 09-CV-164-ART, 2009 WL 2602693, at *3 (E. D. Ky. Aug. 24, 2009).[9]

---

9       Congress has provided an administrative remedy for lost property claimants under 31 U.S.C. § 3723(a)(1), which provides that federal agencies have authority to settle certain "claim[s] for not more than $1,000 for damage to, or loss of, privately owned property that . . . is caused by the negligence of an officer or employee of the United States Government acting within the scope of employment."  The claim must be presented to the head of the agency within one year after the action accrues.  31 U.S.C. § 3723(b).  The Court takes no position on the timeliness of Perry's claim or whether the BOP would settle Perry's claim, if made.

### 3. Failure to Investigate

Perry next alleges that he "complained" to former Warden J.C. Holland and Lieutenant Huberty about the alleged loss or conversion of his property, and that these defendants failed to investigate his claim.  Liberally construing Perry's allegation to state that he filed a proper institutional BP-9 "Request for Administrative Remedy," he nevertheless fails to state a claim upon which relief can be granted on this issue because the denial of a grievance or the failure to act upon the filing of a grievance is insufficient to establish liability under *Bivens* or 42 U.S.C. § 1983.  *See Johnson v. Aramark*, 482 F. App'x 992, 993 (6th Cir. 2012) (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)); *Alder v. Corr. Med. Servcs.*, 73 F. App'x 839, 841 (6th Cir. 2003); *Martin v. Harvey*, 14 F. App'x 307, 309 (6th Cir. 2001).

Further, the denial of administrative remedies does not constitute a violation of Perry's right to due process of law because there is no inherent constitutional right to an effective or responsive prison grievance procedure.  *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Overholt v. Unibase Data Entry, Inc.*, 221 F.3d 1335, at *3 (6th Cir. June 14, 2000) (unpublished table decision) ("Hence, [plaintiff's] allegations that the defendants did not properly respond to his grievances simply do not rise to the level of a constitutional violation."); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991).  Therefore, Perry's Fifth Amendment due process claims against former Warden J.C. Holland and Lieutenant Huberty will be dismissed for failure to state a claim upon which relief can be granted.

### E.  Alleged events at USP-McCreary between April 26, 2014, and May 1, 2014

Perry alleges that on April 26, 2014, Officer "A." Rose harassed him and improperly seized his personal property without a "confiscation form." [Record No. 1, p. 20, ¶¶ 168–69] Again, Perry's claims challenging the allegedly improper confiscation of his personal property are barred by the detention of goods exception to the FTCA as set forth in 28 U.S.C. § 2680(c) and *Ali*, 552 U.S. at 218.

#### 1.  Verbal Abuse

Perry's allegation regarding Rose's comments amount to nothing more than claims of verbal abuse.  And mere verbal abuse and harassment, while unprofessional and discouraged, does not violate the Eighth Amendment.  *Wingo v. Tenn. Dep't of Corr.*, 499 F. App'x 453, 455 (6th Cir. 2012) ("Verbal harassment or idle threats by a state actor do not create a constitutional violation and are insufficient to support a section 1983 claim for relief."); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) (per curiam) (holding that verbal abuse or harassment does not constitute punishment under the Eight Amendment); *Johnson v. Ward*, 215 F.3d 1326, at *1 (6th Cir. May 11, 2000) (unpublished table decision) ("[A prisoner]'s allegation that [a correction officer] made an offensive sexual remark to him does not rise to the level of a constitutional violation."); *see also Searcy v. Gardner*, Civil No. 3:07-0361, 2008 WL 400424, at *4 (M.D. Tenn. Feb. 11, 2008) ("A claim under 42 U.S.C. § 1983 cannot be based on mere threats, abusive language, racial slurs, or verbal harassment by prison officials.").  Therefore, Perry's Eighth Amendment claims against Officer Rose will be dismissed for failure to state a claim upon which relief can be granted.

### 2. Failure to Investigate

Perry contends that, on April 29, 2014, he submitted a "complaint with an affidavit" describing Rose's alleged actions, but that Unit 6 Manger Pamela Poston refused to process it. [*Id.*, ¶ 170] Presumably, Perry is asserting that he was denied due process of law in connection with Poston's alleged refusal to process his administrative remedy and/or "complaint." This claim will also be dismissed because, as previously discussed, the denial of a grievance or the failure to act upon the filing of a grievance is insufficient to establish liability under *Bivens*. *See Johnson*, 482 F. App'x at 993; *Alder*, 73 F. App'x at 841. There is no inherent constitutional right to an effective or responsive prison grievance procedure. *Argue*, 80 F. App'x at 430; *Flick*, 932 F.2d at 728. Accordingly, Perry's Fifth Amendment due process claims against Unit 6 Manger Pamela Poston will be dismissed for failure to state a claim upon which relief can be granted.

### 3. Retaliation

Perry alleges that, on May 1, 2014, Lieutenant Leroy Chaney called him to his office and told him that if he did not drop the complaint concerning Officer Rose, he would be moved to a different housing unit. [*Id.*, ¶¶ 172–73] Perry claims that when he refused to comply, Lieutenant "D." Weiss told him that he was being moved to housing Unit 1B. [*Id.*, ¶ 174] Thereafter, when Perry asked why he was being moved to unit "known to be hostile to inmates from his [Perry's] state," Weiss allegedly replied, "'I'll let the inmates handle our problem for us.'" [*Id.*, p. 21, ¶¶ 175–76].

Perry does not assert that he suffered any actual or adverse injury at the hands of other inmates as a result of being moved into Unit 1B. It is well-established that

"corrections officials retain broad discretion over the administration of prisons, including housing in general and cell assignments in particular." *Quick v. Mann*, 170 F. App'x 588, 590 (10th Cir. 2006) (citing *Bell v. Wolfish*, 441 U.S. 520, 540 n. 23 (1979)).   Further, Prisoners have no constitutional right under the Fourteenth Amendment's Due Process Clause to a particular security classification while incarcerated.  *Moody v. Daggett*, 429 U.S. 78, 88 n. 9 (1976) (citations omitted); *Marchesani v. McCune*, 531 F.2d 459 (10th Cir. 1976).  "The decision where to house inmates is at the core of prison administrators' expertise." *McKune v. Lile*, 536 U.S. 24, 26 (2002) (citing *Meachum v. Fano*, 427 U.S. 215, 225 (1976)).  However, as Perry claims that Lieutenant Leroy Chaney and Lieutenant "D." Weiss retaliated against him because he had filed a "complaint" against Officer Taylor, he has alleged a retaliation claim sufficient to require a response from Chaney and Weiss.  Perry's retaliation claims against Lieutenant Leroy Chaney and Lieutenant "D." Weiss will proceed.

## F. Alleged Events at USP-McCreary between June 27, 2014, and July 4, 2014

### 1. Search of Perry's Cell

Perry states that on, June 27, 2014, Officer David Taylor searched his cell in Unit 1B, allegedly because Perry had filed a "complaint" against Officer Taylor.  Perry complains that he was moved to a holding cell and unable to observe the search.  However, prisoners do not have a constitutional right to watch prison officials search their prison or jail cells.  A prisoner has no legitimate expectation of privacy in his cell.  *See Hudson v. Palmer*, 468 U.S. 517, 530 (1984).  Further, in a somewhat similar case, the Supreme Court ruled that a Michigan correctional rule that required pretrial detainees to remain outside their rooms during routine "shake-down" inspections by prison officials did not violate rights protected

by the Fourth or Fifth Amendments, but simply facilitated safe and effective performance of searches. *Wolfish*, 441 U.S. 520, 557. In upholding the prison's rule, the Supreme Court stated:

> Permitting detainees to observe the searches does not lessen the invasion of their privacy; its only conceivable beneficial effect would be to prevent theft or misuse by those conducting the search. The room-search rule simply facilitates the safe and effective performance of the search which all concede may be conducted. The rule itself, then, does not render the searches "unreasonable" within the meaning of the Fourth Amendment.

*Wolfish*, 441 U.S. at 557.

Perry's objection to the fact that he was not permitted to observe Officer Taylor search his cell on June 27, 2014, fails to state a claim upon which relief can be granted. Perry's claims against Officer David Taylor, Lieutenant Mullins, and Lieutenant Fowler challenging the manner in which they searched his cell on June 27, 2014, will be dismissed.

### 2. Visual Body Cavity Search

Perry also challenges the manner in which "J." Wagner and Lieutenant Ulitzer attempted to conduct a visual body cavity search[10] on June 27, 2014. Perry claims that Wagner and Ulitzer violated BOP policy and his constitutional rights by ordering him to use his hands to spread his buttocks so that they could view his rectal cavity. He further claims that they caused the CERT team to take action to "execute" a full visual inspection of his rectal body cavity. Perry contends that BOP policy required him only to spread his legs,

---

[10] "The term 'strip search' generally refers to an inspection of a naked individual without scrutinizing the subject's body cavities. The term 'visual body cavity search' refers to a visual inspection of a naked individual that includes the anal and genital areas. The term 'manual body cavity search' refers to an inspection of a naked individual with some degree of touching or probing the body cavities." *Daugherty v. Campbell*, 935 F.2d 780, 781, n.1 (6th Cir. 1991) (citing *Blackburn v. Snow*, 771 F.2d 556, 561 & n. 3 (1st Cir. 1985)).

squat, and cough, but not to spread apart his buttocks.  He claims that the order to do so amounted to sexual harassment in violation of his Eighth Amendment rights or an unreasonable search in violation of his Fourth Amendment rights.

The BOP regulation addressing visual searches of inmates is set forth in 28 C.F.R. § 552.11, *Searches of Inmates*, and it provides in relevant part as follows:

(c) Visual search--a visual inspection of all body surfaces and body cavities.

(1) **Staff may conduct a visual search where there is reasonable belief that contraband may be concealed on the person, or a good opportunity for concealment has occurred**.  For example, placement in a special housing unit . . . , leaving the institution, or re-entry into an institution after contact with the public (after a community trip, court transfer, or after a "contact" visit in a visiting room) is sufficient to justify a visual search.  The visual search shall be made in a manner designed to assure as much privacy to the inmate as practicable.

(2) Staff of the same sex as the inmate shall make the search, except where circumstances are such that delay would mean the likely loss of contraband.  Where staff of the opposite sex makes a visual search, staff shall document the reasons for the opposite sex search in the inmate's central file.

28 C.F.R. § 552.11(c) (1) and (2) (emphasis added).

The BOP has implemented a Program Statement ("PS") to effectuate compliance with § 552.11 (c)(1).  In relevant part, PS 5521.05 (June 30, 1997) provides:

**[(1) Staff may conduct a visual search where there is reasonable belief that contraband may be concealed on the person, or a good opportunity for concealment has occurred. For example, placement in a special housing unit (see 28 CFR 541, subpart B), leaving the institution, or re-entry into an institution after contact with the public (after a community trip, court transfer, or after a "contact" visit in a visiting room) is sufficient to justify a visual search. The visual search shall be made in a manner designed to assure as much privacy to the inmate as practicable.]**

28 CFR 541, subpart B, refers to the Program Statement on Inmate Discipline and Special Housing Units. Except in minimum security institutions, inmates must undergo a visual search when leaving the institution, for whatever reason

-28-

(even when being released).   Examples of other situations requiring visual searches include:

- Processing an inmate into an institution through Receiving and Discharge,
- placing an inmate in the Control Unit, and
- conducting periodic visual searches of inmates returning from outside work details.

**[(2) Staff of the same sex as the inmate shall make the search, except where circumstances are such that delay would mean the likely loss of contraband. Where staff of the opposite sex makes a visual search, staff shall document the reasons for the opposite sex search in the inmate's central file.]**

*See* PS 5521.05(6)(b)  http://www.bop.gov/PublicInfo/execute/policysearch?todo=query#  (last visited April 14, 2015) (bold in original).

Contrary to Perry's assertions, nothing in 28 C.F.R. § 552.11 or PS 5521.05 provides that a federal inmate must only spread his or her legs, squat, and cough during a visual body cavity search.  Likewise, relevant case law does not limit searches in the manner that Perry describes.  In *Wolfish*, federal detainees were required to expose their body cavities for visual inspection as part of a strip search conducted after every contact visit with a person from outside the institution.  *Wolfish*, 441 U.S. at 558.  The body cavity searches were conducted without probable cause or reasonable suspicion.  *Wolfish*, 441 U.S. at 558.  If the inmate was a male, he was required to lift his genitals and bend over to spread his buttocks for visual inspection.  *Id.* at 558 n.39.  Balancing the significant and legitimate security interests of the institution against the privacy interests of the inmates, the United States Supreme Court upheld the BOP's regulation as to the body cavity inspection.  *Id.* at 558-60.  The Court considered the scope of the particular intrusion, the manner in which it is conducted, the

justification for initiating it, and the place in which it is conducted. *Id.* at 559. The Court

determined that the body cavity search policy was not unreasonable. Such searches do not

violate the Fourth Amendment's prohibition against unreasonable searches, or the Fifth

Amendment's guarantee of due process. *Wolfish*, 441 U.S. at 560-562.[11]   In reaching this

result, the Supreme Court explained:

> A detention facility is a unique place fraught with serious security dangers.
> Smuggling of money, drugs, weapons, and other contraband is all too
> common an occurrence. And inmate attempts to secrete these items into the
> facility by concealing them in body cavities are documented in this record and
> in other cases. That there has been only one instance where an MCC inmate
> was discovered attempting to smuggle contraband into the institution on his
> person may be more a testament to the effectiveness of this search technique
> as a deterrent than to any lack of interest on the part of the inmates to secrete
> and import such items when the opportunity arises.

*Wolfish*, 441 U.S. at 559 (internal citations omitted).

In *LaPriest*, an Ohio district court addressed very similar facts and found that a prison

camp's policy pertaining to visual cavity searches of inmates did not violate the Constitution.

*LaPriest v. Shartle*, No. 4:10-CV-2385, 2011 WL 841262 (N.D. Ohio Mar. 7, 2011). LaPriest

was incarcerated in the minimum security federal prison camp at FCI–Elkton, where he

worked in a garage located on the prison grounds, but outside the building where he was

housed. *Id.* at *1. LaPriest worked eight hours per day, five days per week, and was always

under the supervision of a corrections officer. *Id.* He alleged that his prison job did not put

him in direct contact with the public, but, even so, when he re-entered the prison each day,

he was subjected to a visual strip search. *Id.* During the search, he was required to open his

---

11      In upholding the BOP regulation, the Supreme Court noted that several lower courts had previously
upheld such visual body-cavity inspections against constitutional challenge. *Wolfish*, 441 U.S. at 560, n.41
(citing *Daughtery v. Harris*, 476 F.2d 292 (10th Cir. 1973), *cert. denied*, 414 U.S. 872 (1973); *Hodges v. Klein*, 412 F.
Supp. 896 (D.N.J. 1976); *Bijeol v. Benson*, 404 F.Supp. 595 (S. D. Ind. 1975); *Penn El v. Riddle*, 399 F. Supp.
1059 (E.D. Va.1975)).

mouth, remove his dentures, run his hands through his hair, present his ears for examination, lift his testicles, lift his arms, and bend over while spreading his buttocks.  *Id.* LaPriest filed a *Bivens* action claiming that the search was humiliating and unwarranted under the circumstances.  He claimed that there was no reason for prison officials to reasonably believe that he was concealing contraband and that FCI–Elkton's practice violated the BOP's policy and his Fourth and Fourteenth Amendment rights.  *Id.*

The district court concluded at the initial screening stage that LaPriest had not stated a claim demonstrating that the camp's policy of permitting visual body cavity searches upon re-entering the prison violated his Fourth or Fourteenth Amendment rights.  *Id.* at *2.  The court held that "[v]isual body cavity inspections during strip searches conducted upon inmates returning to the institution are not 'unreasonable' under the Fourth Amendment, and are reasonably related to valid penological goals."  *Id.* at *1.  The district court further explained, "[b]eing subjected to visual body cavity searches when leaving and re-entering the institution is not an 'atypical or significant hardship in relation to ordinary incidents of prison life.'"  *Id.* at *2 (citing *Sandin*, 515 U.S. at 483).

In *Arruda v. Fair*, 547 F. Supp. 1324 (D. Mass. 1982), a prisoner confined in the segregation unit of a Massachusetts state prison filed a civil rights action alleging that the prison's policy of requiring strip searches, including visual rectal searches, following interviews with visitors, including attorneys, and visits to the prison law library, violated his Fourth Amendment rights, his Eighth Amendment rights, his right to privacy protected by the Fourth and/or the Fourteenth Amendments, and his right of access to the courts, protected by the First Amendment.  *Id.* at 1325.  After a lengthy analysis of both the prison's

-31-

search policies and the manner in which they were executed, the district concluded that none of the search policies, including the visual rectal search, violated the prisoner's federal constitutional rights. *Id.* at 1334–36. In rejecting the testimony of the prisoner's expert witness that the prison's visual rectal search procedure (which, similar to Perry's case, required the inmate to spread his buttocks while bending over) could not achieve its intended purpose of detecting and deterring the secreting of contraband, the district court stated that:

> Dr. Nelson's testimony, however, fails to take into account the fact that contraband may be detected through the visual rectal search when the inmate is required to spread the cheeks of his buttocks while bending over, thereby releasing objects which could be secured between the cheeks and outside of the anus while the inmate is standing. Second, Dr. Nelson fails to take into account the possibility of "trailing," i.e., the failure of a person attempting to secret within his rectal cavity contraband encased in a balloon-like device to insert all of the encasement material beyond the anus. I reject Dr. Nelson's opinion on this topic, as well as his opinion on the negative psychological effects of strip search policy on the residents of MCI-Walpole.

*Id.* at 1331.

Applying the rationale of *Wolfish*, and the express language of 28 C.F.R. § 552.11 and PS 5521.05 to the present case, Perry has not alleged a claim upon which relief can be granted against Wagner and Ulitzer for conducting an alleged visual cavity search under these circumstances. *Wolfish*, *LaPriest*, and *Arruda* upheld federal prison procedures requiring prisoners to make their rectal cavity area fully visible to prison officials, even if that means physically spreading their buttocks so that prison officials have an unobstructed view of that area of their body. *See Arruda*, 547 F. Supp. at 1331. Both the regulation and the statute allow the BOP to conduct a visual search of an inmate where there exists a reasonable belief that contraband may be concealed on the person, or a good opportunity for concealment.

Perry's Complaint demonstrates that the defendants reasonably believed that Perry possessed contraband on June 27, 2014.  He states that when Lieutenant Fowler went in his cell, Fowler stated that he saw an object on a bench behind Perry.  Further, Perry states that his BOP institutional record consists of prior disciplinary convictions for either the possession of contraband or the manufacture of a weapon.  Perry was convicted in this Court of assaulting federal prison officials and possessing a weapon in 2007, resulting in a 225-month sentence.  The courts afford deference to the difficult choices made by prison administrators, and Perry has given no reason for the Court to question the search under the facts as alleged.  *See Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997); *Muhammad v. Bush*, 121 F.3d 708 (6th Cir. 1997) (unpublished table decision) (upholding grant of summary judgment in favor of defendants on male inmate's claim that pat-down search by female guards violated his First Amendment rights).

In its decision in *Spear v. Sowders*, 71 F.3d 626, 629 (6th Cir. 1995) (*en banc*) the United States Court of Appeals for the Sixth Circuit acknowledged that strip and visual body cavity searches are "embarrassing and humiliating," but nonetheless upheld a search of a prison visitor.  *Id.* at 629.  That court aptly observed, "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons and other contraband is all too common an occurrence."  *Id.* at 630 (quoting *Wolfish*, 441 U.S. at 559).  Given these facts and the case law, the Court finds that Perry has not stated a Fourth, Fifth, or Eighth Amendment claim upon which relief can be granted based on the fact of or the manner in which Lieutenant Ulitzer and "J." Wagner conducted, or attempted to conduct, the visual cavity search on June 27, 2014.  Perry's constitutional claims against Lieutenant Ulitzer and

-33-

Officer "J." Wagner regarding all aspects of the visual body cavity searches from June 27–28, 2014, will be dismissed.

### 3. Video footage request

Perry has named Counselor Lawson and Case Manager Jameson as defendants to this action, but he alleges only that he asked these defendants for video footage of the alleged events of June 27, 2014. Perry alleges no facts indicating that they violated his constitutional rights, and defendants without personal involvement or participation in the alleged unconstitutional actions will be dismissed from a *Bivens* action. *Ghandi v. Police Dept. of the City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984); *Rizzo v. Goode*, 423 U.S. 362 (1976).

### 4. Denial of Medical Treatment and Excessive Force

Perry alleges that, on June 28, 2014, when Lieutenant Huberty, Physician Assistant Davis, Nurse Stevens, Lieutenant Fowler and Nurse Sumer came into his cell at intervals to check his restrains, he complained to each of them about pain and loss of circulation in his wrists. [Record No. 1, ¶¶ 77–81] Out of all of these defendants, however, Lieutenant Fowler and Nurse Sumer are the only defendants that Perry claims specifically denied him medical treatment after it was requested. [*Id.*, ¶¶ 80– 81] Perry's Eighth Amendment claims against Lieutenant Huberty, Physician Assistant Davis, and Nurse Stevens alleging the denial of medical treatment between June 27, 2014, and June 28, 2014, will be dismissed. However, Lieutenant Fowler and Nurse Sumer will be required to respond to Perry's Eighth Amendment allegation that they denied him medical treatment on June 28, 2014. Additionally, Lieutenant Ulitzer will be directed to respond to Perry's Eighth Amendment claim that he used excessive force and physically assaulted Perry on June 27, 2014.

Lieutenant Ulitzer will also be required to respond to Perry's pendent state-law claim alleging battery.

### 5.  Denial of Personal Hygiene Needs

Finally, Perry alleges that between June 27, 2014, and July 4, 2014, Lieutenant Ultizer, Lieutenant Fowler, Lieutenant "R." Parsons, and "unknown SHU staff" denied him toilet paper, hygiene supplies, a shower, and a change of clothing.  [*Id.*, ¶ 83]  Perry fails to state a claim upon which relief can be granted regarding this issue.  The Eighth Amendment prohibits a punishment that violates civilized standards of decency or reflects unnecessary and wanton infliction of pain.  *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976).  A viable Eighth Amendment claim has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The objective component requires that the pain be sufficiently serious within the context of "contemporary standards of decency."  *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (citation omitted).  The subjective component requires a plaintiff to show that the defendant acted with deliberate indifference to the inmate's health or safety, *i.e.*, the plaintiff must show that prison officials had a "sufficiently culpable state of mind," where the officials were aware of and disregarded an excessive risk to an inmate's health or safety.  *Farmer*, 511 U.S. at 834.

The long-term denial of basic hygiene items may give rise to an Eighth Amendment claim, but a short-term denial of such items does not qualify as an Eight Amendment violation.  *See*, *e.g.*, *Flanory v. Bonn*, 604 F.3d 249, 254 (6th Cir. 2010) ("Courts have not found the objective component satisfied where the deprivation of hygiene items was temporary."); *Matthews v. Murphy*, 956 F. 2d 275, at *4 (9th Cir. 1992) (unpublished table decision) (noting

that while "it has been held that 'the Eighth Amendment forbids deprivation of the basic elements of hygiene,'" the deprivation of a towel, toothbrush, toothpowder, comb, soap, and other personal hygiene items for approximately 34 days did not rise to the level of an Eighth Amendment violation); *Crump v. Janz*, No. 1:10-CV-583, 2010 WL 2854266, at *4 (W.D. Mich. July 19, 2010) (holding complaint failed to plead an Eighth Amendment violation where inmate asserted "lack of deodorant, toothbrushes, toothpaste, postage, typing and carbon paper, and legal envelopes for 35 days"); *Gilland v. Owens*, 718 F.Supp. 665, 685 (W.D. Tenn. 1989) ("Short term deprivations of toilet paper, towels, sheets, blankets, mattresses, toothpaste, toothbrushes and the like do not rise to the level of a constitutional violation."). Further, Perry alleges no actual harm stemming from the alleged temporary denial of hygiene items. *See Argue v. Hofmeyer*, 80 F. App'x at 430 (holding that a prisoner had failed to state an Eighth Amendment claim because he did not allege a complete denial of hygiene products, or that the deprivation occurred out of indifference to his hygiene needs, or that he suffered any harm because of the alleged denial). Accordingly, Perry's Eighth Amendment claim against Lieutenant Ultizer, Lieutenant Fowler, Lieutenant "R." Parsons, and "unknown SHU staff," alleging the temporary denial of toilet paper, hygiene supplies, a shower, and a change of clothing, will be dismissed for failure to state a claim upon which relief can be granted.

## F. Official Capacity Claims against the USP-McCreary Defendants and Claims against Federal Agencies

Perry asserts claims against all of the USP-McCreary Defendants in their official capacities. These claims will be dismissed because a plaintiff cannot maintain a *Bivens* action against either the federal government or a federal official in his or her official capacity. *Marie v. American Red Cross*, 771 F.3d 344, 365–66 (6th Cir. 2014) (citing *Berger v. Pierce*, 933 F.2d

393, 397 (6th Cir. 1991) ("[P]laintiffs may not recover on *Bivens* claims that are asserted against federal officers in their official capacity.").

Perry also seeks monetary damages from the "Agricultural Department," the Department of Justice, the BOP, and the National Institute of Corrections.  These claims will be dismissed because, again, a plaintiff cannot bring a *Bivens* suit against federal agencies, *see Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 484–86 (1994), or the United States, *see Randall v. United States*, 95 F.3d 339, 345 (4th Cir. 1996).  The United States is immune from suit unless it consents to be sued.  *United States v. Mitchell*, 445 U.S. 535, 538 (1980).  And here, the United States has not waived its sovereign immunity for suits for damages based on claims that its employees' conduct violated the Constitution.  *See Meyer*, 510 U.S. at 483–86 (holding that a *Bivens*-style cause of action did not extend to agencies of the federal government); *Humphrey v. United States Prob. Dep't*, 221 F.3d 1334, at *2 (6th Cir. June 23, 2000) (unpublished table decision) (finding that a *Bivens* suit will not lie against federal agencies, the United States itself, or federal officials sued only in their official capacity).  Thus, to the extent Perry seeks monetary damages from various federal agencies based on the individual defendants' allegedly unconstitutional conduct, his claims for money damages are barred by the sovereign immunity of the United States.

## G. Claims Against Various Other Defendants

Perry has named as defendants the Attorney General (presumably of the United States), and other officials of USP-McCreary: Todd Lambert, Human Resource Manager, "B." Barron, Health Services Administrator, Officer Brown, SHU Property Official, Officer L. Brown, Officer "D" Gardener, Dr. Lemon, "Psy. Dept.," and Dr. Peterson, "Psy. Dept."

-37-

He has not, however, alleged sufficient facts indicating that any of these individuals violated his constitutional rights in any respect.  Rather, it appears that Perry named these individuals *en masse* along with the other defendants with whom he had more extended dealings simply because he may have known their names or have incidentally come into contact with them. The claims against these defendants will be dismissed because Perry does not allege that they were directly or personally involved in the alleged unconstitutional actions described in his Complaint.  *See Ghandi*, 747 F.2d at 352.

Regarding Perry's claim against the "Attorney General," a supervisory government employee is only liable for his or her own misconduct.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009). Perry has not alleged any facts indicating that the United States Attorney General was directly or personally involved in any of the alleged constitutional wrongdoing that he describes.  Thus, Perry appears to be claiming that the unidentified United States Attorney General is liable to him under the doctrine of *respondeat superior*, through which a superior can be held liable for the actions of an employee.  However, *respondeat superior* cannot form the basis of liability in a *Bivens* action.  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978); *Kesterson v. Luttrell*, 172 F.3d 48 (6th Cir. 1998) (unpublished table decision); *Jones v. City of Memphis*, 586 F.2d 622, 625 (6th Cir. 1978).  For these reasons, Perry's claims against the U.S. Attorney General, Todd Lambert, Human Resource Manager, "B." Barron, Health Services Administrator, Officer Brown, SHU Property Official, Officer L. Brown, Officer "D" Gardener, Dr. Lemon, "Psy." Dept." and Dr. Peterson, "Psy. Dept." will be dismissed for failure to state a claim upon which relief can be granted.

**H. Claims Asserted under Various Federal Statutes**

In his Complaint, Perry cites various federal criminal statutes and statutes relating to the duties of the BOP as bases for his claims.  [*See* Record No. 1, pp. 2, 21–22.]   Specifically, Perry attempts to raise claims under 18 U.S.C. §§ 4, 241, 1001(a), 1512–13, 1702, 2234, 2244, 2246, 3621, 4042, and 4352.  However, he does not allege how these statutes apply to him, and these statutes do not provide a private right to action or a jurisdictional basis in this Court.  *See Hamilton v. Reed*, 29 F. App'x 202, 204 (6th Cir. 2002) (citing *Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 386 (6th Cir. 1997); *Diamond v. Charles*, 476 U.S. 54, 64–65 (1986)).  As discussed, Perry's claims fall under 28 U.S.C. § 1331 and *Bivens*.  Accordingly, Perry's claims under these statutes will be dismissed for failure to state a claim upon which relief can be granted.

**I.   Injunctive Relief**[12]

Perry's request for injunctive relief will also be denied.  In his filing docketed as Record No. 19, Perry claims that on, Wednesday, January 28, 2015, "Lieutenant Long" threatened to take retaliatory actions against him based on this civil action.  Perry states that Long threatened to have his cell searched, to send him to the SHU, and to take his legal work.  Perry also claims that the next day, he was taken to the SHU on a "fraudulent contraband charge."   [*Id.*]   In another filing, Perry states that Lieutenant Long is "mentioned" in his Complaint, and again requests the entry of an injunction to prevent the defendants from retaliating him.  [Record No. 21]

---

12   Perry filed a "Notice of Retaliation" [Record No. 19] and a "Renewed Motion for Injunction" [Record No. 21], but has not filed a formal motion for injunctive relief. To the extent that these documents request injunctive relief, the Court will construe these filings as motions for injunctive relief.

A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban Cnty Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). To obtain a preliminary injunction, a plaintiff must show that: (i) he is likely to succeed on the merits, (ii) he is likely to suffer irreparable harm in the absence of preliminary relief, (iii) the balance of equities tips in his favor, and (iv) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997) "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573. However, the failure to show a likelihood of success on the merits is usually fatal. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). The proof required for a plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

Under the first criteria, it is premature to determine if Perry is likely to succeed on the merits of the few claims which will be been allowed to proceed. He has alleged only minimal facts regarding the claims which have survived initial screening, and the defendants may assert several defenses to those claims. "Before a district court undertakes to override the prerogatives of . . . correctional authorities in the administration of any aspect of prison administration, it must assure itself that no less intrusive means of bringing about compliance with constitutional requisites is available." *Glover v. Johnson*, 855 F.2d 277, 286 (6th Cir. 1988).

Regarding the second factor to be considered under the preliminary injunction analysis, Perry alleges no facts showing that he will suffer irreparable harm if the injunction is not issued. And he likewise fails to satisfy the third criterion of the preliminary injunction analysis, *i.e.*, Perry alleges no facts which even remotely suggest that the denial of the requested injunction would cause substantial harm to others. Even absent any such factual allegations from Perry, the Court is faced with balancing his interest in obtaining a broad injunction against "retaliation" with the defendants' presumed interests in managing their prison procedures and resources and avoiding interference from a federal court. Under the facts of this case, the balance weighs against issuing a preliminary injunction.

Finally, because Perry does not allege that the public interest would be served by issuing an injunction. Thus, he fails to satisfy the fourth criterion of the preliminary injunction analysis. In constitutional cases, an inquiry into the public interest is difficult to separate from the likelihood of success on the merits because "the public interest is promoted by the robust enforcement of constitutional rights." *Am. Freedom Def. Initiative v. Suburban Mobility for Reg. Transp.*, 698 F.3d 885, 896 (6th Cir. 2012). The public interest in leaving the administration of federal prisons to federal prison administrators is another factor weighing against preliminary injunctive relief in this case.

## IV.

Based on the foregoing discussion and analysis, it is hereby

**ORDERED** that:

1.      All claims asserted by Plaintiff Oceanus Perry against the following defendants in both their official and individual capacities are **DISMISSED WITH PREJUDICE,** and

these defendants are **TERMINATED** from this action: the United States Attorney General; J.C. Holland, Warden, USP-McCreary; Captain Christopher Maruka; Ronald Corriveau, SIS Agent; Todd Lambert, Human Resources Manager; Lieutenant Carol, SIS Agent; Lieutenant Huberty; Lieutenant William Duck; David Mullins; Lieutenant Mark Dixon; Richard Parson; Lieutenant Baker; "Stevens," Health Services Administrator; "B." Barron, Health Services Administrator; "Davis," Physician Assistant; "Baker," Physician Assistant; Nurse Stevens; Pamela Poston, Unit Manager; Mrs. Jameson, Case Manager; Mr. Lawson, Unit Counselor; Shelia L. Mattingly, Mailroom Supervisor; Mr. Vires, Mailroom Employee; Officer Brown, SHU Property Officer; Officer R. Thurman, SHU Property Officer; Officer L. Brown; Officer Barnett; Officer D. Gardner; Officer A. Rose; Officer David Taylor; Gary Mehler, Disciplinary Hearing Officer; Richard B. Ives, Former Warden, USP-McCreary; "Dr. Velaspues" or "Dr. Valasquez;" E.M.T. Christopher Griffis; Dr. Lemon, "Psy." Department; Dr. Peterson, "Psy." Department; Dr. Figuroa, "Psy." Department; "H. Quay," Former Associate Warden, USP-McCreary; Staff, Federal Transit Center-Oklahoma, Oklahoma City, Oklahoma; Lieutenant Daniels, Federal Transit Center-Oklahoma; Dr. Kahn, Federal Transit Center-Oklahoma; Officer "D." Brush Federal Transit Center-Oklahoma; and Officer "Lessner" and/or "Lesser," Federal Transit Center-Oklahoma.

2.      Perry's federal constitutional claims against the Agricultural Department, the Department of Justice, the Bureau of Prisons, and the National Institute of Corrections are **DISMISSED WITH PREJUDICE**, and these defendants are **TERMINATED** from this action.

3.      Perry's claims alleging violations of 18 U.S.C. §§ 4, 241, 1001, 1512–13, 1702, 2234, 2244, 2246, 3621, 4042, and 4352 are **DISMISSED WITH PREJUDICE**.

4.      Perry's requests for injunctive relief [*See* Record Nos. 1, 19, 21.] are **DENIED WITH PREJUDICE**.

5.      Perry's federal constitutional claims against Defendants Lieutenant Leroy Chaney, Lieutenant "D." Weiss, Lieutenant Ultizer, Lieutenant Fowler, and Nurse Sumer, in their **OFFICIAL CAPACITIES**, are **DISMISSED WITH PREJUDICE**.

6.      The following defendants, in their **INDIVIDUAL CAPACITIES**, are required to respond to Perry's *Bivens* Complaint as to the following claims: (a) Lieutenant Leroy Chaney must respond to Perry's claim of alleged retaliation on May 1, 2014; (b) Lieutenant "D." Weiss must respond to Perry's claim of alleged retaliation on May 1, 2014; (c) Lieutenant Ultizer must respond to Perry's Eighth Amendment allegation of excessive force and his state-law claim of battery on June 27, 2014; (d) Lieutenant Fowler must respond to Perry's Eighth Amendment claim that he denied Perry medical treatment on June 28, 2014; and (e) Nurse Sumer must respond to Perry's Eighth Amendment claim that she denied him medical treatment on June 28, 2014.

7.      A Deputy Clerk in the London Clerk's Office shall prepare a "Service Packet" for these five defendants. The Service Packet shall include:

a.      a completed summons form;

b.      the Complaint [Record No. 1] and all attachments thereto;

c.      this Order; and

d.      a completed USM Form 285.

8.      The Deputy Clerk shall send the Service Packets to the USMS in Lexington, Kentucky.

9.      For each defendant to be served, the USMS shall serve them by:

        a.      Sending a Service Packet by certified or registered mail to the Civil Process Clerk at the Office of the United States Attorney for the Eastern District of Kentucky;

        b.      Sending a Service Packet by certified or registered mail to the Office of the Attorney General of the United States in Washington, D.C.; and

        c.      Personally serving the defendants with a Service Packet through arrangement with the Federal Bureau of Prisons.

10.     The USMS is responsible for ensuring that the defendants are successfully served with process.  In the event that an attempt at service upon any defendant is unsuccessful, the USM shall make further attempts and shall ascertain such information as is necessary to ensure successful service.

11.      Within 40 days of the date of entry of this Order, the USMS Office shall send a Service Report to the London Clerk's Office, which the Deputy Clerk shall file in the record, stating whether service has been accomplished with respect to the defendant.

        a.      If a defendant is served by certified mail, the Service Report shall include:

                (i)      a copy of the green card showing proof of service; or

(ii)     a statement that the green card was not returned from the U.S. Postmaster, along with a "Track-and-Confirm" report from the U.S. Postal Service showing that a proof of delivery does not exist.

b.     If a defendant is personally served, the Service Report shall indicate:

(i)     that the defendant was successfully served personally, or

(ii)     a statement explaining why the defendant could not be served and what efforts are being taken to locate the defendant and accomplish personal service.

12.     Perry must immediately advise the London Clerk's Office of any change in his current mailing address.  **FAILURE TO DO SO MAY RESULT IN THE DISMISSAL OF THIS ACTION**.  Perry must communicate with the Court **SOLELY** through notices or motions filed with the London Clerk's Office.  **THE COURT WILL DISREGARD CORRESPONDENCE SENT DIRECTLY TO THE JUDGE'S CHAMBERS.**

13.     With every notice or motion filed with the Court, Perry **MUST:** (a) mail a copy to each defendant (or his or her attorney); and (b) at the end of the notice or motion, certify that he has mailed a copy to each defendant (or his or her attorney) and the date on which this was done.  **THE COURT WILL DISREGARD ANY NOTICE OR MOTION WHICH DOES NOT INCLUDE THIS CERTIFICATION.**

14.     The Clerk of the Court shall transmit a copy of this Memorandum Opinion and Order to the Clerk of the United States Court of Appeals for the Sixth Circuit, referencing Case No. 15-5212.

-45-

This 16th day of April, 2015.



Signed By:

**_Danny C. Reeves_** DCR

**United States District Judge**