UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| OCEANUS PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6: 14-168-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| AGRICULTURAL DEPT., et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*\*\*  \*\*\*\*\*  \*\*\*\*\*  \*\*\*\*\*

The matter is pending for consideration of the motion to dismiss or, alternatively, for summary judgment filed by Defendants Leroy Chaney, Lieutenant at United States Penitentiary ("USP")-McCreary, Donald Weiss, Lieutenant at USP-McCreary, John Fowler, Lieutenant at the USP-McCreary, David Altizer, Lieutenant at USP-McCreary, and Stephanie Sumner, Nurse at USP-McCreary.  [Record No. 53]  For the reasons discussed herein, the Court will grant the defendants' motion.

**I.**

Perry filed this action in July 2014, asserting various claims against fifty-one defendants.  [Record No. 1]  Perry asserted constitutional claims under 28 U.S.C. § 1331, pursuant to the doctrine announced in *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971), and tort claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§1346(b), 2671-80.  Perry filed other motions

seeking injunctive relief to prohibit the defendants from retaliating against him. [Record Nos. 19 and 20]   Among his other claims, Perry alleged that: (i) Defendants Chaney and Weiss retaliated against him in response to an institutional complaint against another USP-McCreary official; (ii) on June 27, 2014, Defendant Altizer assaulted him and applied excessive force; and (iii) Defendants Fowler and Sumner denied him medical treatment and were deliberately indifferent to his serious medical needs.

Perry asserts that he filed a complaint on May 1, 2014, with the Supervisory Investigative Agent ("SIA") at USP-McCreary about disputes with Officer A. Rose during the previous month.  [Record No. 1, p. 20 ¶¶ 167-171]  Perry alleges that Chaney summoned him to his office to address the complaint, and told Perry that if he did not drop the complaint against Rose, he would move Perry to a different housing unit.  [*Id*. ¶¶ 172-173]  Perry claims that, when he refused to drop the complaint, he was placed in a holding cell until later that evening when Lt. Donald Weiss released him and moved him to a different housing unit.  [*Id*. ¶ 174].  Perry questioned Weiss about why he was being moved to a housing unit with inmates who were known to be hostile toward inmates from Perry's state.  [*Id*. ¶ 175].  Perry alleges that Weiss responded, "I will let the inmates handle our problem for us." [*Id*. ¶ 176].

Perry claims that, on June 27, 2014, while Altizer was transporting him from the Special Housing Unit ("SHU") to an area near medical and the R&D [Receiving and Discharge] department, Altizer applied excessive force and

physically assaulted him, placed him in restraints, and took him to the SHU.  [*Id.* ¶¶ 48, 68]  Perry alleges that, on June 28, 2014, Fowler and Nurse Sumner conducted the "first shift restraints checks" and during those checks, he complained of loss of feeling in his right hand.  [*Id.*, ¶¶ 72-74]  Sometime after 9:30 a.m., Perry was escorted by Fowler to R&D where he underwent an x-ray body scanner.  [*Id.* ¶¶ 78-79].  Perry alleges that he again complained to Fowler that the restraints were hurting his wrists and causing him to lose feeling in his right hand.  [*Id.* ¶ 80]  Perry contends that later that same day (June 28, 2014), during afternoon pill distribution in the SHU, he showed his wrists to Sumner and complained of a loss of feeling in his right wrist.  However, Nurse Sumner refused to either treat his writs or provide a medical request form.  [*Id.*, ¶ 81]

On April 16, 2015, the Court screened Perry's federal Complaint, dismissing all claims except those asserted against Chaney, Perry, Altizer, Fowler, and Sumner.  Perry's request for a preliminary injunction also was denied. [Record No. 23]  On May 29, 2015, the Sixth Circuit dismissed as premature Perry's interlocutory appeal of the dismissal of most of his *Bivens* claims, but allowed his appeal of the denial of the preliminary injunction to proceed.  [Record No. 34]  Thereafter, on June 13, 2015, Perry filed an Amended Complaint in which he broadly reiterated his prior allegations that the USP-McCreary staff conspired against him, punished him, and discriminated against him for filing a complaint alleging staff misconduct.  [Record No. 37]

On October 22, 2015, the Sixth Circuit dismissed Perry's appeal of the denial of his request for a preliminary injunction. [Record No. 62]  In dismissing Perry's appeal, the Sixth Circuit concluded that "Perry has failed to establish a substantial likelihood that he would prevail on the merits of his remaining claims." [*Id.*, p. 2]

In July 2015, the five remaining defendants moved the Court to either dismiss the claims asserted against them or enter summary judgment in their favor. [Record No. 53]  Each submitted sworn Declarations refuting Perry's claims against them.  Further, Joshua Billings, Senior Attorney at the Consolidated Legal Center ("CLC") at the Federal Medical Center in Lexington, Kentucky, submitted a Sworn Declaration detailing Perry's federal sentences as well as his institutional history.[1] [Record No. 53-2] The defendants argue that Perry did not properly exhaust his claims under the BOP's administrative remedy process or, alternatively, that they are entitled to summary judgment because no genuine issue of material facts exists regarding Perry's First and Eighth Amendment claims. Finally, the defendants argue that Perry's state tort "assault" claim against Altizer should be dismissed because Perry failed to file an FTCA administrative claim.

On September 28, 2015, Perry filed a "Motion for Docket Entries," claiming that when he was transferred from USP-McCreary to USP-Lewisburg, all

---

[1]   In his capacity as the Senior CLC Attorney, Billings has access to all BOP records maintained on Perry, including records contained in the Inmate Central Files, and SENRY, the computer data base which contains inmates' personal data, administrative remedy history, sentence computation, disciplinary history, housing assignments and other pertinent information.  [Record No. 53-2, ¶ 2]

of his property and documents relating to this case were seized and/or the subjedt of tampering.  Thus, he contends that he was unable to properly respond to the defendants' motion. [Record No. 58]  Perry attached his own affidavit in which he claimed that, while trying to respond to the defendant's motion to dismiss/summary judgment, he was denied access to the Inmate Electronic Law Library ("ELL") on specific occasions and that he was also denied access to his personal property and legal materials.  [Record No. 58-1]

The defendants responded that Perry's right of access to the courts was not hindered.  [Record No. 61]  Billings indicates that, after Perry was transferred from USP-McCreary to USP-Lewisburg, he had ongoing access to the ELL and that he used it on multiple dates, often for substantial periods.  [Record No. 61, p. 2]  Billings also indicates that, on September 21, 2015, Perry received six boxes of personal property including three boxes of legal materials.  Perry admits that he received his personal property and legal papers on September 21, 2015.  [Record No. 58-1, p.2, ¶ 10]

The defendants acknowledge that Perry may have experienced some delay in receiving his legal material and that on a few specific dates he may not have had access to the ELL.  However, they argue that Perry was not prejudiced by the delay.  The defendants note that the Court promptly granted Perry's request for additional time and that Perry subsequently received his personal property, used the law library, and filed a response to their motion.  On February 9, 2016, the Court denied Perry's motion seeking docket entries.  [Record No. 66]

## II.

### A.    The May 1, 2014, Incidents

Chaney states that, on April 28, 2014, Perry submitted an "Informal Resolution Form" in which he complained about an incident involving Officer Rose which occurred two days earlier.  [Chaney Decl., Record No. 53-3, ¶ 3; *see also* Record No. 53-2, pp. 75-76, "Informal Resolution Form"]  In his informal remedy request, Perry alleged that Officer Rose had threatened to physically and sexually assault him, and had stolen his personal property.  On May 1, 2014, Chaney met with Perry as part of the investigation regarding his allegations.  [*Id.*]  Chaney states that during this meeting, he did not instruct or ask Perry to "recant" his complaint against Officer Rose, but told Perry that: (i) he needed to submit a sworn affidavit to verify the allegations of his complaint; (ii) he needed to be fully truthful in his affidavit; and (iii) if he intended to change any details about his allegations, he should do so before he signed the affidavit and submitted his complaint.  [*Id.*]

According to Chaney, Perry did not wish to change his story but, instead, intended to proceed with his sworn affidavit.  Chaney took Perry's statement and prepared an affidavit which Perry reviewed and signed.  [*Id.*, ¶ 4]  Lt. Chaney determined that, to decrease the possibility of further conflict, it was best for Perry, Officer Rose, and the institution, if Perry was moved to another housing unit where Officer Rose did not work.  [*Id.*]  Chaney explains that Perry's new housing unit was still located general population, and not in the more restrictive

Special Housing Unit ("SHU").  By remaining in the general population, Perry could continue to participate in the same prison programs and work with the same Unit Team.  [*Id*.]

Chaney states that his decision to transfer Perry to another housing unit was not in retaliation for Perry's having filed a complaint against Officer Rose.  [*Id*., ¶ 5]  Further, Chaney indicates that Perry's new housing assignment (Unit 1B) did not subject Perry to any increased risk of danger because all housing units at USP-McCreary have inmates from variety of backgrounds, race and geographical locations.  [*Id*., ¶ 5; *see also*, Weiss Decl., Record No. 53-4, ¶ 4]  Chaney further explains that all housing decisions are made to prevent one group from becoming too strong within a unit, thus ensuring the safety of all inmates.  [*Id*.]

Defendant Weiss contends that he did not know that Perry had filed a complaint against Officer Rose because BOP policy prevented him from learning about any complaint filed by a prisoner against a prison staff member.  [Weiss Decl., Record No. 53-4, ¶ 3]  Weiss states that, pursuant to BOP Program Statement ("PS") 1210.24, allegations of staff misconduct remain confidential and only authorized staff have access to the files and information relating to those allegations.  [*Id*.]  Weiss states that because he was the "on-duty" Lieutenant at USP-McCreary, he did not have access to the files which the SIA office maintained, including the staff misconduct files, and that if he ordered Perry to report to his new housing unit, he did not do so based on any knowledge that Perry had lodged a complaint against Officer Rose.  [*Id*.]  Weiss asserts, that because he

was unaware that Perry had filed a complaint against Rose, he could not have retaliated against Perry based on his having filed a complaint against a prison official. [*Id*.]

### B.    The June 27-28, 2014, Incidents

Fowler states that when Perry became involved in a dispute with the Correctional Officer who was searching his cell on June 27, 2014, Perry was escorted to "…the Lieutenant's Office at USP McCreary." [Fowler Decl., Record No. 53-5, ¶ 3]  While Perry was in the holding cell of the Lieutenant's Office, Fowler observed a homemade weapon in Perry's cell.  As a result, Perry was placed in the SHU pending the outcome of a disciplinary investigation and hearing based on the charge of possession of a weapon.[2]  [*Id*.]  Perry was escorted from the Lieutenants' Office to SHU.  [*Id*.]

Altizer denies that he took Perry to a remote area of the prison and assaulted him on June 27, 2014.  [Altizer Decl., Record No. 53-6, ¶ 3]  He states that when Perry arrived in the SHU, Perry was instructed to remove his clothing and submit to a visual search.  [*Id*. ¶ 4]  And while Perry removed his clothing, he refused to submit to a visual search.  [*Id*.]  Based on Perry's poor attitude and history of possessing weapons, a calculated "use of force team" was assembled at

---

[2]   Billings states that Perry was charged with *Possession of a Weapon*, a BOP violation. However, after Perry requested that the footage from a surveillance camera be preserved, the Incident Report was expunged because the staff had failed to preserve the footage. *See* Billings Decl. Record No. 53-2, ¶ 4.  According to BOP Program Statement, 5270.09, *Inmate Discipline Program*, an expunged Incident Report is physically removed from an inmate's file and is only available to certain users of the SENTRY Database, and further documentation of that incident and report are unavailable.  [*Id*.]  The expungement is also documented in the "Inmate Discipline Incident Report History."  [*Id*., at p. 16]

the Warden's direction to place Perry in hard ambulatory restraints until he could display an extended period of calm behavior. [*Id.*] Lt. Altizer states that, before the "use of force team" entered the cell, Perry submitted to restraints, was removed from the cell, pat searched, cleared with a metal detector, provided with new clothing, and placed in hard ambulatory restraints at 9:10 p.m., on June 27, 2014. [Fowler Decl., Record No. 53-5, ¶ 6]

At that time, Nurse Stephanie Sumner performed a medical assessment of Perry. [Sumner Decl., Record No. 53-7, p. 1, ¶ 3; *id.*, pp. 4-5] Sumner noted in her assessment that Perry denied having any pain or injuries. [Record No. 53-7, p. 1 ¶ 4; *see also* p. 4] Further, Nurse Sumner did not observe any injuries and concluded that the restraints were adequately placed because she could place a finger between the cuff and Perry's wrist. [*Id.*] Sumner noted that Perry had good circulation, positive pulses and normal vital signs. [*Id.*]

BOP policy requires prison lieutenants to conduct checks of inmates held in ambulatory restraints every two hours. [Fowler Decl., Record No. 53-5, ¶ 5 (citing BOP PS 5566.06, *Use of Force and Application of Restraints*)] In accordance with that policy, prison lieutenants checked Perry's ambulatory restraints on June 27, 2014, at the following two-hour intervals: 9:10 p.m. and 11:10 p.m., and on June 28, 2014, at 1:10 a.m., 3:10 a.m., 5:10 a.m., 7:10 a.m., and 9:10 a.m. [*Id.*, ¶¶ 5-6]

On June 28, 2014, Fowler checked Perry's restraints at 9:10 a.m., and again at 11:10 a.m. [*Id.* ¶ 6] During the 9:10 a.m. check, Perry "…continued to refuse

-9-

to submit to a visual search and continued to display a poor attitude." Fowler determined that Perry, therefore, should remain in ambulatory restraints. [*Id.*, ¶ 7] When Fowler checked Perry's restraints at 11:10 a.m., Perry complied with staff orders and agreed to submit to a visual search, and the ambulatory restraints were removed. [*Id.* ¶ 7] Fowler states that at that time, he observed no injuries to Perry's wrists, and that the restraints did not appear to have been applied in such a manner as to have restricted circulation in Perry's hands. [*Id.*]

Fowler attached to his Declaration the "Two-Hour Lieutenant Restraints Check Form 24-Hours." [Record No. 53-5, pp. 5-7]. This report consists of eight separate entries of the lieutenants who were monitoring Perry's status every two hours while he remained in restraints. These entries reflect that, during the first seven two-hour checks, Perry refused to submit to a proper visual search. [*Id.*] On June 28, 2014, Lt. Fowler wrote:

> Inmate complied with Staff orders. Removed from Restraints @ 11:10 a.m.

> **Action Taken**: Removed from Ambulatory Restraints

### C.     Perry's Administrative Exhaustion Efforts

On May 27, 2014, Perry submitted a Request for Administrative Remedy to the Warden. That the request was assigned Remedy Identification Number ("RIN") 780768-F1. [Record No. 53-2 ¶ 6; *see also*, Request for Administrative Remedy at Record No. 53-2, p. 74]. Perry alleged that, on April 29, 2014, he filed a complaint against Correctional Officer Rose, but that it had never been

processed and that, on May 1, 2014, he e-mailed the SIA about the alleged lack of a response.  [*Id.*]  Perry also stated that later that day, Lt. Chaney questioned him about his complaint and the incident with Officer Rose.  [*Id.*]  Perry indicated that he "experienced reprisal in the form of loss of job and moving to a separate housing unit which was a hostile environment for inmates from my regional area." [*Id.*]  Perry asked that Officer Rose be removed from his duties.  [*Id.*]

On June 4, 2014, Warden J.C. Holland denied Perry's remedy request, identified as RIN 780768-F1, explaining that allegations of staff misconduct were taken seriously, but that inmates were not entitled to learn the outcome, if any, of the reviews of such claims.  [*Id.* ¶ 7; *see also*, Record No. 53-2, p. 77]  Warden Holland also informed Perry that if he was dissatisfied with the response, he could appeal the decision to the Regional Director.  [*Id.*]  According to Billings, Perry did not file an appeal with the Regional Director.  [Record No. 53-2, ¶ 7]

On that same day (June 4, 2014), Perry submitted a Request or Administrative Remedy to the Regional Director for the BOP's Mid-Atlantic Region ("MARO").  [*Id.*, ¶ 8; *see also*, Record No. 53-2, p. 67 ("Administrative Remedy Generalized Retrieval Full Screen Format"]  The MARO identified the remedy request as RIN No. 781874-R1 and listed the description of the issue asserted as "Other Complaint Against Staff."  [Record No. 53-2, p. 67]    The following day, the MARO rejected RIN No. 781874-R1 because: (1) it was not submitted on the proper form; (2) a request at the institutional level had not been filed before filing at the MARO (as required by the BOP's administrative remedy

process), and (3) the issues raised in the filing were not sensitive in nature.  [*Id.*]
Perry's remedy request and supporting materials were returned to him.  [*Id.*]

On July 14, 2014, and September 15, 2014, Perry submitted administrative
remedy appeals to the BOP's Office of General Counsel, in which he challenged
decisions relating to administrative discipline.[3]  [Billings Decl., Record No. 53-2,
p. 4, ¶ 9; *see also*, *id.*, at p. 68 ("Administrative Remedy Generalized Retrieval
Full Screen Format"]  The General Counsel's Office rejected both appeals and
returned them to Perry because he had not submitted the appeals on the proper
form.  [*Id.*]  According to Billings, even if Perry had complied with the filing
requirements, those appeals involved disciplinary actions and were unrelated to
the claims Perry is asserting in this proceeding.  [Record No. 53-2, p. 4, ¶ 9.]
Billings states that, during the spring of 2015, Perry filed several administrative
remedy requests in which he complained of "staff misconduct" and
"unprofessional conduct by staff," but that Perry filed all of those remedy requests
well past the 20-day filing requirement.  Further, all were rejected for various
deficiencies.  [*Id.*, at ¶ 10]

To the extent Perry may seek to substitute the United States as a party
based on his allegation that Lt. Altizer assaulted him, Billings states that Perry
failed to present an administrative claim for injuries related to those alleged torts
as required by 28 U.S.C. § 2675.  [*Id.*, p. 5 ¶ 12]  Billings further indicates that

---

[3]   One of the remedy requests which Perry submitted to the BOP Office of General
Counsel was identified as RIN No. 770659-R2, but Billings did not identify the RIN of
the other remedy request which Perry submitted.

since June 27, 2014 (the date on which Perry alleges that Altizer assaulted him), Perry has submitted three FTCA administrative claims, but two of those claims concerned personal property issues (Case Type Classification, Section 3723), while the other involved an unrelated incident on March 17, 2015.  [*Id.*; *see also* FTCA claim form dated 5/14/15, Record No. 53-2, p. 79]  Perry has not submitted any FTCA administrative claim alleging that Altizer assaulted him on June 27, 2014.  [*Id.*]

### D.    The Defendants' Legal Arguments

The defendants argue that the Court should dismiss the remaining claims asserted against them because Perry failed to properly and fully exhaust all of the constitutional claims according to the specific steps set forth in the BOP's administrative remedy process.  They contend that they are entitled to summary judgment because no genuine issue of material fact exists regarding any of Perry's claims alleging retaliation, excessive force and/or assault, or deliberate indifference to his medical needs.  Finally, the defendants assert that, to the extent that Perry asserts a state law assault claim against Lt. Altizer under the FTCA, that claim should be dismissed because Perry  failed to present an administrative claim as required by 28 U.S.C. § 2675.  Absent such exhaustion, the defendants contend that this Court lacks subject-matter jurisdiction over any FTCA claim alleging assault.

## III.

On October 5, 2015, Perry responded to the defendants' motion, claiming that he was denied the opportunity to conduct full discovery prior to defendant's request for summary judgment.  [Record No. 60]  Perry alleged that he needed access to audio and video footage regarding the force applied to him on June 27, 2014, to demonstrate that it was unnecessary; that he complained on camera about his physical injuries; and that the restraints applied were excessive and punitive. Perry also asserted that he needed access to various personnel files to demonstrate that the defendants have a propensity to engage in aggressive and assaultive behavior.  He further alleged that if he were able to conduct discovery, such discovery would show that prison staff is inadequately trained; that they deviate from USP-McCreary's Institutional Supplements (local policy and procedures); and that the defendants are aware of and/or witnessed violations of Perry's Eighth Amendment rights and failed to intercede.  [*Id.*, pp. 1-2]

Perry claims that Altizer used excessive force to punish him, but that Altizer used the excuse/pretext that Perry had refused to submit to a visual search to justify the use of force.  [*Id.*, p. 2]  Perry states that he remained in ambulatory restraints for three days (June 27, 2014 to June 30, 2014) and that being left in the restraints for an extensive period of time violates BOP PS 5566.06 "Use of Force." [*Id.*, pp. 3-4]

Perry argues that Chaney's justification for moving him to Unit 1B (because it would allegedly decrease the possibility of conflict between him and

Officer Rose) lacked merit because later in June 2014, Officer Rose was assigned to work in Unit 1 "prior to the completion of the investigation."  [*Id.*, p. 3]  Perry also contends that Chaney claimed that Perry would have the same Unit Team after the transfer.  However, after the transfer, he actually had a different Unit Team but the same Unit Manager.  [*Id.*]  Perry further disputes Weiss's position that he knew nothing about the complaint filed against Officer Rose.  Perry states that, during the shift change, Lt. Weiss told Perry that Lt. Chaney had told him (Weiss) about the complaint which Perry had filed against Officer Rose.  [*Id.*]  Perry further states:

> When inmate returned to Unit 6 from Lieutenant's office, to move his property, Unit Officer Jenkins also knew about the inmate filing the complaint.  Thus, how was Lt. Chaney confidential?  Lt. Weiss told unit 1B officer of Plaintiffs situation.

[*Id.*, p. 3]

Perry attached the handwritten affidavit of a federal inmate identified as Antonio Harris, BOP Register No. 04694-061.[4]  [Record No. 60-1, pp. 3-4]  In this affidavit dated June 11, 2014, Harris stated what Perry had told him about the events surrounding the May 1, 2014, event.  [*Id.*, ¶¶ 1-6]  Harris states that Perry asked him to accompany Perry to Lt. Chaney's office on May 1, 2014, *see id.*, ¶ 2, but Harris does not state that he actually accompanied Perry to Lt. Chaney's office on May 1, 2014.  Harris merely reiterates what Perry told him about his (Perry's) conversation with Lt. Chaney, *see id.* ¶ 3.  Harris states that when he helped Perry

---

[4]  Perry may have written Harris's affidavit.  The handwriting appears nearly identical to Perry's handwriting.

move to Unit 1B, the inmates in that Unit were hostile to Perry because he was from Ohio, and that "a violent incident took place in Unit 1B several days before which involved inmates from Ohio who Perry associated with."  [*Id.*, ¶ 8]  Harris further states that when Lt. Weiss walked into Unit 1B, he (Harris) told Weiss that Perry needed to be moved to another unit because Perry was from Ohio, but that Weiss responded, "I know he's right where we want him to be."  [*Id.*, ¶ 9]

Perry also attached the affidavit from USP-Lewisburg inmate "J." (Joshua) Meregildo, BOP Register No. 64832-054.[5]  [*Id.*, pp. 5-6]  Meregildo states that, on July 3, 2014, he and Perry were confined in the same SHU cell in USP-McCreary. [*Id.*, ¶ 1].   Meregildo states that Perry had open sores on both wrists and that Perry told him the sores were painful, itching, and burning because he had not had a shower since June 27, 2014.  [*Id.*, ¶ 2]  Meregildo states that Physicians' Assistant Bryant told Perry that he would order Naproxen for the pain and an antibiotic for possible infection, but that when Perry told Bryant the sores came from the restraints, Bryant said that there was nothing he could do.  [*Id.*, ¶ 4]  Meregildo states that, on July 7, 2014, while Nurse Sumner was conducting the pill line, Perry showed her his wrists and asked, "[w]hy are you refusing me medical treatment?"  Sumner replied, to the effect of, "[i]f you were not in restraints, you would not have to worry about your wrists," and walked away.  [*Id.*, ¶¶ 5-6]

---

[5]   Perry may have also written Meregildo's affidavit.  The handwriting appears to be nearly identical to Perry's handwriting.

In their reply, the defendants dispute Perry's claim that discovery is needed.  [Record No. 63]  They contend that Perry has alleged in only broad terms that he needs to conduct discovery to respond to their motion.  They further assert that Perry did not identify the specific discovery needed.  Finally, the defendants contend that discovery would not change the legal and factual defects of Perry's case.

## IV.

### A.    Motion for Docket Entries [Record No. 58]

The Court recently denied this motion [Record No. 66], but will address the issue in more detail insofar as Perry's motion is integral to the defendants' pending motion.  On August 13, 2015, Perry moved the Court for an extension of time to respond to the defendants' motion to dismiss or for summary judgment. On the same date, the Court granted Perry's motion and extended the deadline to respond through September 29, 2015. [Record No. 57]  On September 23, 2015, Perry filed a motion asking the Court to provide him with pleadings that had been filed in this matter, claiming that his transfer to USP-Lewisburg had delayed the receipt of his legal papers and that he had been unable to access to ELL on specific occasions.  Perry also claimed that these events had limited his ability to respond to the defendants' motion.  [Record No. 58]

Two days later, Perry filed a response to the defendants' motion.  Perry's response included his affidavit, the affidavits of two other BOP prisoners, correspondence to the Office of Inspector General, a July 3, 2012, letter from

Perry to the "Bureau Director," the BOP's July 8, 2015, response to Perry's Freedom of Information request, and excerpts from various BOP Program Statements. [6]  [Record No. 60; Record No. 60-1; 60-2]

Billings has sufficiently documented that, after Perry's transfer to USP-Lewisburg, the plaintiff had ongoing access to, and used, the ELL on multiple occasions between July 26, 2015, and September 27, 2015, for periods lasting from eight to 115 minutes.  [Record No. 61-1].  Perry admits that he received his personal property and legal papers on September 21, 2015. [Record No. 58-1, p. 2, ¶ 10]  While he may have experienced some initial delay in receiving his personal property and legal materials, Perry suffered no actual prejudice from that initial delay because he filed a timely, comprehensive response to the defendants' motion which was supported by several affidavits and numerous other exhibits.  Because Perry's right of access to the courts was not impaired, the Court denied his motion requesting docket entries on February 9, 2016.  [Record No. 66]

### B.     Motion to Dismiss/Summary Judgment [Record No. 53]

#### 1.     Standard of Review

Because both parties have submitted sworn declarations and other materials outside of the pleadings, the Court will treat its arguments as a motion for summary judgment under Federal Rule of Civil Procedure 56.  *See Soper v.*

---

[6] Perry's Response [Record No. 60] was docketed on October 5, 2015 but under the "prison mailbox rule," it was timely because Perry dated it "September 25, 2015."  [*Id.*, p. 6]. *See Richard v. Ray*, 290 F.3d 810, 812–13 (6th Cir. 2002) (*per curiam*) (extending *Houston v. Lack*, 487 U.S. 266 (1988)).

*Hoben*, 195 F.3d 845, 850 (6th Cir. 1999); *Song v. City of Elyria, Ohio*, 985 F.2d 840, 842 (6th Cir. 1993).   A motion under Rule 56 challenges the viability of another party's claim by asserting that at least one essential element of that claim is not supported by legally-sufficient evidence. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).   To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact.  *Klepper v. First American Bank*, 916 F.2d 337, 341–42 (6th Cir. 1990).   Drawing all reasonable inferences in favor of the nonmoving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The moving party does not need his or her own evidence to support this assertion, but need only point to the absence of evidence to support the claim. *Turner v. City of Taylor*, 412 F. 3d 629, 638 (6th Cir. 2005).   The responding party cannot rely upon allegations in the pleadings, but must point to evidence of record in affidavits, depositions, and written discovery which demonstrates that a factual question remains for trial.  *Hunley v. DuPont Auto*, 341 F. 3d 491, 496 (6th Cir. 2003); *United States v. WRW Corp.*, 986 F. 2d 138, 143 (6th Cir. 1993) ("A trial court is not required to speculate on which portion of the record the non-moving party relies, nor is there an obligation to 'wade through' the record for specific facts.").

-19-

A district court must review all of the evidence presented by the parties in a light most favorable to the responding party, with the benefit of any reasonable factual inferences which can be drawn in his favor. *Harbin-Bey v. Rutter*, 420 F. 3d 571, 575 (6th Cir. 2005). If the moving party demonstrates that there is no genuine dispute as to any material fact and that he or she is entitled to a judgment as a matter of law, he or she is entitled to summary judgment. *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F. 2d 125, 127 (6th Cir. 1992). If the applicable substantive law requires the responding party to meet a higher burden of proof, his evidence must be sufficient to sustain a jury's verdict in his favor in light of that heightened burden of proof at trial. *Harvey v. Hollenback*, 113 F. 3d 639, 642 (6th Cir. 1997); *Moore, Owen, Thomas & Co. v. Coffey*, 992 F. 2d 1439, 1444 (6th Cir. 1993). The Court will now examine the record to determine if the defendants have carried their burden of proof.

### 2.    First Amendment Retaliation Claims Against Lt. Chaney and Lt. Weiss

The defendants argue that Perry failed to properly and fully exhaust his First and Eighth Amendment claims in accordance with the BOP's administrative remedy process, including any assault claim that might fall under the FTCA. In his response, Perry states that he requested the appropriate administrative remedy forms but prison officials refused to provide those forms to him. The Court concludes that the defendants have demonstrated that Perry failed to

administratively exhaust his First Amendment retaliation claims against Chaney and Weiss.

On May 27, 2014, Perry submitted a grievance form (a BP-9 Request for Administrative Remedy) to the Warden which was identified as RIN 780768-F1, and was classified as a claim alleging "Inappropriate Conduct by Staff."  [Record No. 53-2, p. 3, ¶ 6; *see also*, Record No. 53-2, p. 67]  In that remedy request, Perry alleged that (i) a complaint which he had filed against Officer Rose in late April-early May 2014 had never been processed; (ii) he had e-mailed the SIA advising of the alleged inactivity; and (iii) on May 1, 2014, Lt. Chaney had questioned him about his complaint against Rose.  Perry also alleged that he "… experienced reprisal in the form of loss of job and moving to a separate housing unit which was a hostile environment for inmates from my regional area due to an incident which took place several weeks prior."  [*Id*.]   [Record No. 53-2, p. 3, ¶ 6; *see also*, Remedy Request, Record No. 53-2, p. 74]

On June 4, 2014, Warden J. C. Holland responded, stating that allegations of staff misconduct were taken seriously, but that inmates are not entitled to the outcome of investigations into claims alleging staff misconduct. [Billings Decl., Record No. 53-2, p. 3, ¶ 7; Holland's Response, Record No. 53-2, p. 77]  Holland informed Perry that if he was not satisfied with the response, he could appeal the decision to the Regional Director.  [*Id*.]   However, Perry did not appeal.  *See*

Billings Decl., Record No. 53-2, p. 3, ¶ 7.  Perry contends that the prison staff prevented him from exhausting his claims. [Record No. 60].[7]

Perry's stated excuse for not properly exhausting his retaliation claim lacks merit.  Warden Holland denied Perry's BP-9 remedy request on June 4, 2014, but Perry did not file the requisite BP-10 appeal to the BOP's Regional Office at any time thereafter.  Perry blames his failure to appeal the denial of his retaliation grievance to the BOP's Regional Office on the fact that he was confined in the SHU and that while confined in the SHU, various prison officials allegedly refused to provide him with appeal forms.  But according to Perry's own version of the facts, he was not sent to the SHU until June 27, 2014, or over three weeks **after** Warden Holland denied his BP-9 remedy request.  Perry does not allege, and the record does not reflect, that Perry was confined in the SHU during the almost three-week period between June 4, 2014, and June 27, 2014.

Perry offers no explanation for his failure to appeal Warden Holland's June 4, 2014, denial of remedy request (RIN 780768-F1) to the MARO within the

---

[7] Perry states:

> In regards to the section titled "Administrative Remedy History; it is Plaintiff's position that he attempted traditional utilization of the administrative remedy/inmate grievance process.  However, staff refused him the standard forms.  In particular, Unit Manager Poston, former counselor Lumley, Case Manager Clark, and Counselor Lawson repeatedly refused administrative remedy forms while Plaintiff in S.H.U. (6/27/2014 until 8/26/14).  Most importantly, staff cannot address issues which they are unaware of...."

[Record No. 60, p. 5]

-22-

proper time-frame.  And to the extent that he blames that failure on the alleged actions or inactions of various prison officials during his confinement in the SHU (some three weeks later), his argument lacks merit.

On June 4, 2014, (the same date on which Warden Holland denied Perry's remedy request identified as RIN No. 780768-F1) the MARO received a Request for Administrative Remedy from Perry which it classified "Other Complaint against Staff," identified as RIN 781874-R1.  [Billings Decl., Record No. 53-2, p. 4 ¶ 8; *see also*, Record No. 53-2, p. 67]  The next day, the MARO rejected RIN 781874-R1 because: (i) it was not submitted on the proper form; (ii) Perry had not filed a request at the prison before filing at the regional level as required by the BOP's administrative remedy program; and (iii) the issues raised in the filing were not sensitive as Perry had alleged.  [Billings Decl., R. 53-2, p. 4, ¶ 8; *see also id.*, p. 67]

However, filing a BP-9 "Request for Administrative Remedy" with the MARO is **not** the procedure dictated by the BOP's administrative remedy process. The BOP's tiered administrative grievance process, known as the Administrative Remedy Program, is set forth in BOP PS 1330.16, *Administrative Remedy Program*, and in 28 C.F.R. §§ 542.10-542.19.  Under this process, an inmate must first informally present an issue of concern to staff using a "BP-8" form, and the staff must attempt to informally resolve the issue before the inmate submits a formal grievance.  28 C.F.R. § 542.13(a).  If the issue cannot be resolved informally, the inmate may initiate the formal grievance process by submitting a

-23-

formal written grievance, using the appropriate Administrative Remedy Request Form ("BP-9" form), to the Warden of the prison.  28 C.F.R. § 542.14.

If the inmate is not satisfied with the Warden's response, he may then appeal to the BOP's Regional Director (for the geographical region in which he is confined) using a "BP-10" form.  28 C.F.R. § 542.15.  Finally, if the inmate is not satisfied with the Regional Director's response, he may appeal to the BOP's Office of General Counsel ("OGC"), using a "BP-11 form".  An appeal to the OGC is the final step in the Administrative Remedy Program and the grievance process.  28 C.F.R. § 542.15.

The Prison Litigation Reform Act of 1995 ("PLRA") provides:  "No action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement is mandatory. *Jones v. Bock*, 549 U.S. 199, 216 (2007).  Further, prisoners must comply with an agency's deadlines and other critical procedural rules, which means "…going through all of the steps that the agency specifies, obeying all directions, and adhering to all deadlines set by the administrative rules."   *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "Proper exhaustion demands compliance because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Id*. at 90-91; *see also Peterson v. Cooper*, 463 F. App'x 528, 530 (6th Cir. 2012) (citing *Wooford* and holding that to satisfy the exhaustion

-24-

requirement, a prisoner must "complete the administrative review process in accordance with the applicable procedural rules.")

Thus, in addition to failing to appeal Warden Holland's June 4, 2014, denial of his remedy request (RIN No. 780768-F1) to the MARO, Perry submitted an incorrect form to the MARO on June 4, 2014, when he claimed that he was raising a "sensitive" issue. The MARO immediately rejected that non-compliant submission on June 5, 2014. [Billings Decl., Record No. 53-2, p. 4, ¶ 8; *see id.*, p. 67] Again, when Perry submitted RIN 781874-R1 to the MARO on June 4, 2014, he was **not** confined in the SHU on that date.

To the extent Perry blames his failure to submit the proper remedy form to the MARO on his alleged confinement in the SHU, the facts refute his argument. Even so, the MARO rejected RIN 781874-R1 on June 5, 2014, finding that Perry had not set forth a "sensitive" issue, and Perry did not cure his defective remedy request while he remained in the prison's general population.

Perry is thoroughly familiar with the BOP's administrative remedy process, having filed 111 administrative remedies since his federal confinement began in 2005. [Billings Decl., Record No. 53-2, pp. 2-3, ¶ 5; pp. 15-73] Perry's detailed grievance history establishes that he has repeatedly flouted the simple requirements of the BOP's administrative remedy process by filing one non-compliant remedy request after another, resulting in the outright rejection of approximately 61 of his 111 attempted administrative remedy submissions. [*Id.*]

Between 2009 and 2015, Perry  repeatedly violated the remedy process by: (i)  prematurely submitting remedy requests to the BOP's Regional Office without first submitting a BP-9 grievance to the Warden; (ii) prematurely submitting a formal remedy request to the Warden without first having submitted an informal remedy; (iii) failing to submit his remedy request or appeal on the proper form; (iv) failing to include necessary attachments; (v) failing to observe the stated page limitations; submitting BP-10 appeals to the wrong Regional Office; (vi) sending remedy requests by mail instead of through the institution; and (vii) raising issues that had been addressed and decided in prior remedy proceedings.  [*Id.*]

Failure to exhaust is an affirmative defense and can serve as a basis for dismissal if properly proven by the defendants.  *See Jones v. Bock*, 549 U.S. at 216.  Here, the July 20, 2015, Declaration of Joshua Billings and the authenticated BOP records attached to it "… establish the absence of a 'genuine dispute as to any material fact' regarding nonexhaustion." *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (quoting Federal Civil Rule 56(a)); *see also, Werdlow v. Caruso*, No. 09-11009, 2009 WL 4948490 at *6 (E.D. Mich. Dec. 14, 2009) ("… failure to exhaust does provide sufficient basis for dismissal under Rule 56(c).")

Perry was required to submit his appeal of the denial of RIN 7080768-F1 to the BOP's Regional Office on or before June 24, 2014, which was **three days** before he was sent to the SHU on June 27, 2014.  Perry's conclusory allegation-- that the USP-McCreary prison staff prevented him from exhausting his retaliation claims by not providing him with the proper forms while he was confined in the

SHU--is refuted by the record.  And as other courts have recognized, conclusory allegations are not evidence and are not adequate to oppose a motion for summary judgment.  *Miller v. Aladdin Temp-Rite, LLC*, 72 F. App'x 378, 380 (6th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990).

Perry did not fully and completely exhaust his First Amendment retaliation claims against Cheney and Weiss stemming from the alleged events of May 1, 2014.  Thus, no genuine issue of fact exists with respect to the defendants' argument and affirmative defense that Perry failed to properly and fully exhaust his retaliation claims based on the alleged events of May 1, 2014.

Further, Perry's retaliation claim lacks substantive merit.  To be sure, retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). To establish a First Amendment retaliation claim, the plaintiff must prove that: (1) the plaintiff engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was taken at least in part because of the exercise of the protected conduct. The plaintiff has the burden of proof regarding all three elements.  *See*, *e.g.*, *Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003); *Green v. Tudor*, 685 F. Supp. 2d 678, 692 (W.D. Mich. 2010).

Moreover, the plaintiff must prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001). If the plaintiff makes such a showing, the defendants may still avoid liability by showing "that [they] would have taken the same action in the absence of the protected activity." *Whiteside v. Parrish*, 387 F. App'x 608, 612 (6th Cir. 2010) (quoting *Thaddeus-X*, 175 F.3d at 399); *Jones v. Smolinski*, No. 1:09-CV-633, 2010 WL 7370364, at *6 (W.D. Mich. Aug. 31, 2010). Here, Chaney has demonstrated that he would have taken the same action of moving Perry to another housing unit even if Perry had *not* filed his institutional complaint against Officer Rose.

Perry alleges that in late April 2014, he filed an institutional complaint in which he alleged that Officer Rose had threatened to physically and sexually assault him. The institutional complaint constitutes protected activity but, given the serious nature of Perry's allegations against Officer Rose, Chaney's decision to immediately move Perry to another area of the prison (away from Officer Rose) was not unreasonable, especially since Perry had complained to the SIA that no action had been taken on his complaint against Officer Rose. A prudent prison administrator would or should take the same action where an inmate has alleged that a correctional officer in his housing unit has threatened to assault him. As Chaney explains, Perry remained in the general population, was able to continue

-28-

participating in his prison programs and, at that time, was not placed in the more restrictive SHU.  [Record No. 53-3, p. 2, ¶ 4]

An inmate does not have a liberty interest in assignment to a particular institution.  *Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Meachum v. Fano*, 427 U.S. 215, 224-25 (1976); *Montanye v. Haymes*, 427 U.S. 236, 243 (1976); *Newell v. Brown*, 981 F.2d 880, 883 (6th Cir. 1992); *Beard v. Livesay*, 798 F.2d 874, 876 (6th Cir. 1986).  "A fortiori, an inmate has no constitutional right to be confined in a particular cell within that prison." *Mulazim v. Corrigan*, 7 F. App'x 427, 429 (6th Cir. 2001) (citing *Williams v. Faulkner*, 837 F.2d 304, 309 (7th Cir. 1988)).  Absent "extraordinary circumstances" decisions about "cell assignments are a normal part of prison life, and thus typically do not amount to an adverse action." *LaFountain v. Harry*, 716 F.3d 944, 949 (6th Cir. 2013).

Here, "extraordinary circumstances" were not present.  Chaney's Declaration substantiates that placing Perry in Unit 1B was not an act of retaliation because that unit did not subject Perry to any increased level of danger.  All housing units in USP-McCreary are comprised of inmates from various backgrounds, races, and geographical locations.  Further, housing assignments are made to prevent one group from a particular demographic are from becoming too strong within that unit.  [Record No. 53-3, p. 2, ¶ 5]

Perry offers only his conclusory allegations that Unit 1B was an adverse placement due because it allegedly housed inmates who were known to be hostile to inmates from his state of Ohio.  Perry submits an affidavit (which he appears to

have prepared) from Inmate Antonio Harris, who states that "… inmates in Unit 1B were hostile towards Perry and did not want accept him in any cells due to Perry [being] from Ohio and a violent incident took place in Unit 1B several days before which involved inmates from Ohio who Perry associated with." [Record No. 60 pp. 3-4] But Harris's affidavit appears to be hearsay based on what Perry told Harris, *not* based on Harris's own personal knowledge and observations that inmates in Unit 1B were hostile towards all inmates from Ohio. Chaney and Weiss have demonstrated that no genuine issue of material fact exists regarding Perry's retaliation claim. For the reasons outlined above, they are entitled to summary judgment on this claim.

### 3. Eighth Amendment Excessive Force Claims Against Altizer

Perry claims that Altizer assaulted him on June 27, 2014, but Altizer denies that allegation. Regarding this issue, Perry responds as follows to the defendant's motion:

> "… Plaintiff was assaulted in the R & D department near the x-ray body scanner. Specifically, Plaintiff was pushed into the wall and had his handcuffs yanked upward by unknown staff accompanied by Lt. Altizer. Plaintiff suffered a sore right shoulder.

[Record No. 60, pp. 2-3]

The Eighth Amendment prohibits prison officials from using excessive force against inmates. *See e.g.*, *Wilkins v. Gaddy*, 559 U.S. 34, 37-40 (2010); *Farmer v. Brennan*, 511 U.S. 825, 832-835 (1994); *Hudson v. McMillian*, 503 U.S. 1, 4-9 (1992); *Whitley v. Albers*, 475 U.S. 312, 318-22 (1986). The Eighth

Amendment also protects prisoners from cruel and unusual punishment imposed by "the unnecessary and wanton infliction of pain." *Hudson* 503 U.S. at 5. To maintain prison security and discipline, however, inmates may be subjected to physical contact that would be actionable as assault under common law. *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002). "To determine whether a claim of assault rises to a level of constitutional magnitude, a court must consider the reasons or motivation for the conduct, the type of force used, and the extent of the inflicted injury." *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993).

An Eighth Amendment claiming alleging excessive force by officials has both an objective and subjective component. *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014). Objectively, the pain inflicted by the prison official must be "sufficiently serious" to offend "contemporary standards of decency." *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). Thus, the nature and extent of a prisoner's injury may be indicative of the amount of force applied. *Hudson*, 503 U.S. at 9.

The subjective component looks to the state of mind of the prison official. *Moore*, 2 F.3d at 700. The question "ultimately turns on 'whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Whitley*, 475 U.S. at 321). To evaluate the prison official's state of mind, a district court must consider the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible

officers, and any efforts made to temper the severity of a forceful response. *Hudson*, 503 U.S. at 7 (citation omitted); *see also Brooks v. Kyler*, 204 F.3d 102, 106 (3rd Cir. 2000) (listing same criteria); *Baldwin v. Stalder*, 137 F.3d 836, 840 (5th Cir. 1998) (same). When considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).

In his Response, Perry does not specifically state that Altizer pushed him and yanked his handcuffs. Instead, his description is, at best, ambiguous. A fair reading of Perry's description of the alleged incident suggests that another unidentified USP-McCreary officer pushed him and yanked his handcuffs, and that Altizer had merely "accompanied" that unidentified officer. To the extent the Perry is specifically alleging that Altizer pushed him against the wall and yanked his handcuffs, he fails to allege facts that create a genuine issue of material fact regarding his excessive force claim.

Under the objective prong of the Eighth Amendment excessive force inquiry, Perry's allegation that he was pushed and that his hand cuffs were "yanked upward" does not describe physical contact that could be considered as sufficiently serious to offend contemporary standards of decency. As noted, in evaluating an Eighth Amendment excessive force claim, the extent of the alleged injury can provide some indication of the amount of force applied. *Wilkins*, 130 S. Ct. at 1178. Here, Perry alleges that as a result of this alleged contact, he suffered

-32-

a "sore shoulder."   But other than his own self-serving allegations and conclusions, he offers no other independent evidence showing that his sore shoulder required medical treatment or that after the alleged contact, he suffered any physical problems.   "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1031 (2d Cir. 1973). The Supreme Court has cited *Johnson* as authority for the proposition not every "malevolent touch" by a prison guard gives rise to a federal cause of action.   *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Johnson*, 481 F.2d at 1031). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* (some internal quotation marks omitted).

The subjective prong of an Eighth Amendment excessive force inquiry requires the Court to determine if Altizer's alleged use of force on June 27, 2014, was carried out "maliciously and sadistically," rather than as part of "a good-faith effort to maintain or restore discipline."   *Wilkins*, 130 S. Ct. 1180; *Hudson*, 503 U.S. at 7.  But based on the facts presented here, the Court must conclude that any use of force applied to Perry on that date was undertaken in a good-faith effort to either maintain or restore discipline.

Fowler states that, on June 27, 2014, he discovered a homemade weapon in Perry's cell and ordered Perry to be placed in the SHU pending the outcome of a

disciplinary investigation.  [Fowler Decl., Record No. 53-5, ¶ 3]  Both Fowler and Altizer state that when Perry arrived in the SHU, he was ordered to submit to a full visual search, but Perry refused to comply with that directive.  [Record No. 53-6, ¶ 4; Record No. 53-5, ¶ 4]  Altizer states that that Perry had a history of possessing weapons and when Perry arrived in the SHU, he was demonstrating a poor attitude.  [Record No. 53-6, ¶ 4]  Both Altizer and Fowler testify that, based on these considerations, a calculated use of force team was needed to place Perry in hard ambulatory restraints until he could display calm behavior for an extended period of time.  [Record No. 53-6, ¶ 4; Record No. 53-5, ¶ 4]  Thus, the calculated force, as described in 28 C.F.R. § 552.22, *Principles governing the use of force and application of restraints*;[8] and BOP PS 5566.06, *Use of Force and Application of Restraints* (Nov. 30, 2005) (referencing 28 C.F.R. § 552.20) was used on Perry.

Altizer's description of Perry's criminal history is accurate.  Perry is currently serving an aggregate 675-month sentence, which includes a 41-month prison term for Armed Bank Robbery in violation of 18 U.S.C. § 2113(A), an 87-month prison term for Using and Carrying a Firearm During and in Relation to a Crime of Violence in violation of 18 U.S.C. § 924(c), a 210-month prison term for Assaulting a Federal Law Enforcement Officer in the Performance of Official Duties and Aiding and Abetting in violation of 18 U.S.C. §§ 111(A)(1) and (B) and 18 U.S.C. § 2, and a 15-month prison term for Inmate in Possession of a

---

[8] 28 C.F.R. § 552.23, *Confrontation avoidance procedures*, identifies the steps which the ranking custodial officials must take before resorting to use of force.

Prohibited Object in violation of 18 U.S.C. § 1791(A)(1).[9]  [Record No. 53-2, ¶ 3; *see also*, "Inmate Data," Record No. 53-2, pp. 6-11.]  Perry's criminal history unquestionably involves not only possession of weapons both in and out of prison, but also an assault on a prison guard.

Weapons unquestionably pose a threat to the safety and security of both inmates and staff members.  In situations where weapons have been discovered in a prisoner's cell, prison officials do not always have the luxury of time to ponder the full extent to which a prisoner might present a more serious threat to the institution or the people in it, especially when that prisoner was previously convicted of possessing a prohibited object in a federal prison and assaulting a prison official.

Altizer also attached to his Declaration a Memorandum to USP-McCreary Captain "C." Marauka which he noted that Perry's security threat group status was "Assault-Correctional Staff and Sovereign Citizen."   [Record No. 53-6, p. 4]  Neither Altizer nor Fowler could know with certainty whether Perry was

_____

[9]   On September 17, 2007, Perry, then an inmate at the USP-Big Sandy in Inez, Kentucky, was involved in a prison fight with three other inmates and three prison guards.  During the assault another inmate handed Perry a "shank." The video shows Perry placing that object on the ground nearby before entering the fight.  [*Id.* at 2-3] The jury found Perry guilty of forcibly assaulting, or aiding and abetting the assault of, prison officers and inflicting bodily injury on them in violation of 18 U.S.C. § 111(a), and with knowingly possessing a prohibited object intended to be used as a weapon, in violation of 18 U.S.C. § 1791(a)(2),(b)(3).  Perry received a 225-month prison sentence which runs consecutively to his earlier federal sentences for armed bank robbery and illegal firearm uses.  *See United States v. Oceanus Perry*, No. 7:07-CR-23-GFVT-EBA-4 (E.D. Ky. 2007).  The Sixth Circuit affirmed Perry's conviction and sentence. [Record No. 291, therein; *see United States v. Oceanus Perry*, No. 08-6219, 401 F. App'x 56 (6th Cir. Nov. 4, 2010)].

concealing contraband or a weapon on or in his person, or whether Perry might assault one of them, as he had assaulted a USP-Big Sandy guard in 2007. Altizer testifies that, because Perry was exhibiting a poor attitude, he was ordered to submit to a visual search. When Perry refused to comply, he was placed in restraints according to BOP PS 5566.06.

The BOP authorizes the use of force: (i) when prison officials are unable to gain control of an inmate; (ii) to protect and ensure to protect and ensure the safety of inmates, staff and others; (iii) to prevent serious property damage; and (iv) to ensure institution security and good order. *See* 28 C.F.R. § 552.22, *Principles governing the use of force and application of restraints*; *see also* BOP PS 5566.06, *Use of Force and Application of Restraints* (Nov. 30, 2005) (referencing 28 C.F.R. § 552.20).

The "Program Objectives" of PS 5566.06 provide as follows:

a. Force will ordinarily be used only when attempts to gain voluntary cooperation from the inmate have not been successful.

b. When force is used, it will be only the amount of force required to subdue an inmate, or preserve or restore institution security and good order.

c. Confrontation avoidance techniques will be used when feasible to avoid calculated use of force situations.

BOP PS 5566.06, Page 2. This Program Statement authorizes the use force when prison officials are attempting to enforce institutional regulations. *See* BOP PS 5566.06, *Principles Governing the Use of Force and Application of Restraints*, P. 6. The section of that Program Statement entitled "Types of Force," (referencing

-36-

28 C.F. R. § 552.21) provides, "[a]lthough this is not always possible, staff must use common sense and good correctional judgment in each incident to determine whether the situation allows for the implementation of calculated or immediate use of force procedures." *Id.*, p. 4. Thus, the BOP correctional officers must employ their judgment and "common sense" in deciding whether an immediate or calculated use of force is warranted, and that judgment must be evaluated on a case-by case basis. *See Kaufman v. United States*, 84 F. Supp.3d 519, 528-29 (S.D. W.Va. Jan. 7, 2015) (observing in an FTCA action that that the BOP's regulations governing "Use of Force" set forth in 28 C.F.R. § 552.22 *et seq.*, "… do not prescribe a course of conduct, but instead allow BOP staff to determine when force is necessary and the appropriate extent of that force, taking into account the circumstances of each specific situation," and that "… 28 C.F.R. § 552.20 granted Officer Baynard the discretion to determine that force was appropriate and 28 C.F.R. § 552.22 granted Officer Baynard discretion to determine the necessary force to bring plaintiff back under control.")

The use of calculated force as described in 28 C.F. R. § 552.20 and BOP PS 5566.06 necessarily implies that some degree of physical force will be employed to enable prison officials to gain control of an inmate. Clearly, if a prisoner voluntarily submitted to correctional orders and instructions, no use of force of any kind would be required.

Perry offers no competent evidence, other than his own self-serving, subjective allegation that the "force" applied to him was excessive. In

determining whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," one court has observed that "… even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he caused …, any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'" *Fuentes v. Wagner*, 206 F.3d 335, 346 (3d Cir. 2000).

"Judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," it was reasonable for Fowler and Altizer to use the discretion afforded them and conclude that the calculated use of force was required. Other district courts, presented with similar claims asserted by federal prisoners who displayed aggressive behavior, have held that the use of calculated and/or immediate force pursuant to BOP PS 5566.06 was warranted and that the amount of force employed was not excessive. *See e.g.*, *Ziddell v. Morris*, No. 4:11-CV-845-A 2013 WL 704325, at *5 (N.D. Tex. Feb. 26, 2013) ("Given plaintiff's disruptive and aggressive conduct, the potential was great that plaintiff could continue to disrupt the unit or cause serious harm to himself or others. Under these circumstances it was reasonable for Morris and Brown to use the discretion afforded them and conclude that an immediate (rather than calculated) use of force was required."); *McCullon v. Saylor*, No. 3:12-CV-445, 2013 WL 1192778, at *18 (M. D. Pa. Mar. 4, 2013) (granting summary judgment against prisoner who alleged excessive force against prison officials who applied by

-38-

calculated force pursuant to BOP policy); *Landor v. Bledsoe*, No. 1:11-CV-759, 2012 WL 6864999, at *16 (M. D. Pa. Dec. 11, 2012); *Abdullah v. Seba*, No. 3:13-CV-1227, 2014 WL 4828222, at *13 (M. D. Pa. Sept. 29, 2014) (granting summary judgment and finding no Eighth Amendment violation where the use of restraints was both reasonable and necessary in light of the prisoner's threatening behavior).

The Supreme Court has explained that avoiding potential danger within the prison and maintaining safety are penological objectives which "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 127 (1977); *Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979); *Ward v. Dyke*, 58 F.3d 271, 273 (6th Cir. 1995)  The Supreme Court has also observed that prisons present an "ever-present potential for violent confrontation." *Whitley*, 475 at 321 (1986) (quoting *Jones*, 433 U.S. at 132).  *See also Wolff v. McDonnell*, 418 U.S. 539, 561-62 (1974) (noting that prisons are populated by violent offenders, causing unremitting tension among inmates and between inmates and guards).  Protecting prison security is central to all other correctional goals. *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989); *Meadows v. Hopkins*, 713 F.2d 206, 209-10 (6th Cir. 1983).

Further, the time that Perry spent in ambulatory restraints between 9:00 p.m. on June 27 2014, and 11:00 a.m. on June 28, 2014, does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. *See Hunter v. Bledsoe*, No. 10-CV-927, 2010 WL 3154963 (M.D. Pa. Aug. 9, 2010) (upholding ambulatory restraints used for 24 hours); *Holley v. Johnson*, No. 08-CCV-629, 2010 WL 2640328 (W.D. Va. June 30, 2010) (upholding ambulatory restraints used for 48 hours); *Zimmerman v. Schaeffer*, 654 F.Supp.2d 226, 232 (M.D. Pa. 2009) (upholding 19 hours or more in restraint chair); *Moore v. Miller*, No. 7:08-CV-614, 2009 WL 113258 (W.D. Va. Jan.15, 2009) (26 hours); *Keyes v. O'Brien*, No. Civ. A. 7:06-CV-437, 2006 WL 2125912 (W.D. Va. July 27, 2006) (no Eighth Amendment violation where prisoner placed in ambulatory restraints for 30 hours); *Garraway v. United States*, No. 04–CV–01049, 2006 WL 3054606, at *8 (D. Colo. July 24, 2006) (upholding 50 hours in ambulatory restraints).

Perry states in his unsworn Response that he was kept in "restraints" from June 27, 2014, to June 30, 2014, but he offers no other competent evidence to substantiate that conclusory, self-serving allegation.   [Record No. 60, p. 3] Conversely, Fowler has submitted the BOP's official records which reflect that Perry was held in ambulatory (ankle) restraints for 14 hours, not three (3) days. Those official record entries were made by Fowler and the other prison lieutenants as they conducted the eight separate "two-hour" checks on Perry pursuant to BOP policy.  [Record No. 53-5, pp.  5-7]  Those entries document that Fowler removed

Perry's ambulatory restraints at 11:10 a.m. on June 28, 2014, after a period of approximately fourteen hours.

The BOP's records have been properly authenticated and constitute competent evidence regarding the amount of time Perry spent in ambulatory restraints. Perry's unsupported and conclusory assertion that the defendants have altered or fabricated the BOP's official records regarding either the amount of time that he was held restraints or the status reports made while he was restrained is insufficient to counter the defendants' evidence.  Again, conclusory allegations are not evidence and are not sufficient to overcome a properly supported motion for summary judgment.  *Miller*, 72 F. App'x at 380; *McDonald*, 898 F.2d at 1162. Based on the authorities cited above, keeping an inmate in ambulatory restraints for fourteen hours does not violate the Eighth Amendment's prohibition against cruel and unusual punishment.  Altizer is entitled to summary judgment regarding Perry's Eighth Amendment excessive force claim.

### 4.      Eighth Amendment Deliberate Indifference Claims Against Lt. Fowler and Nurse Sumner

Perry claims that Lt. Fowler and Nurse Sumner were deliberately indifferent to his serious medical needs because they failed to respond to his complaint that his wrist restraints were too tight and were causing him pain. Fowler and Sumner contend that Perry has failed to satisfy either of the elements of an Eighth Amendment deliberate indifference claim with respect to this allegation.

Again, the Eighth Amendment prohibits prison officials from acting with deliberate indifference to a prisoner's objectively serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A deliberate indifference claim has both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Id*. Under the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.*

Perry has failed to demonstrate through competent evidence that he suffered a serious injury (required under the objective prong of an Eighth Amendment deliberate indifference analysis) or that Fowler and Sumner were deliberately indifferent to his medical needs (required under the subjective prong of an Eighth Amendment deliberate indifference analysis). Both Weiss and Fowler testify that, pursuant to BOP policy, "Lieutenant Checks" were conducted on Perry every two hours to assess his condition in light of the restraints applied. These checks began on June 27, 2014, at 9:10 p.m., occurred again at 11:10 p.m., and continued through June 28, 2014, at 1:10 a.m., 3:10 a.m., 5:10 a.m., 7:10 a.m., and 9:10 a.m. [Record No. 53-5, ¶¶ 5-6]. On June 28, 2014, Fowler himself checked Perry's restraints at 9:10 a.m., and 11:10 a.m. [*Id.*, ¶ 6]

During the 9:10 a.m. check on June 28, 2014, Perry "… continued to refuse to submit to a visual search and continued to display a poor attitude." Fowler determined that Perry, therefore, should remain in ambulatory restraints. [*Id.*, ¶ 7] Fowler states that at 11:10 a.m., Perry agreed to submit to a visual search and his ambulatory restraints were removed. [*Id.*] Fowler further states that he did not observe any injury to Perry's wrists, and that it did not appear that the wrist restraints had been applied in a manner that restricted Perry's circulation. [*Id.*, ¶ 7] Fowler explains that he is not a trained medical professional and is not classified as such in his position with the BOP. As a result, he relied on the judgment of the prison's medical providers regarding all medical issues or concerns.

Nurse Sumner shares Fowler's description of Perry's status while he remained in restraints, stating that the prison's medical staff monitored and evaluated Perry's wrists twice within an eight hour shift as required by BOP PS 5566.06, and that those checks occurred on June 27, 2014 at 9:10 pm (she performed that check herself) and the next day, June 28, 2014, at 5:40 a.m., 7:00 a.m., and at 8:55 a.m. [Record No. 53-7, ¶¶ 5-6] Nurse Sumner states that when she and the other medical staff members checked Perry, he had "positive pulses," his vital signs were normal, and his circulation showed no signs of being compromised. [*Id.*, ¶¶ 6-7] Nurse Sumner testifies that when she monitored Perry at 9:10 p.m. on June 27, 2014, she observed no injuries to Perry's wrists; Perry denied any complaints of pain or injuries; and that the restraints were adequately

positioned because she could place a finger between the restraint cuff and Perry's wrist.  [Record No. 53-7, ¶ 4; *see also*, other medical reports from June 27-28, 2014, Record No. 53-7, pp. 7-8]

Further, in the "Clinical Health Services Encounter" record of June 27, 2014, the "Cause of Injury" section of that report states: "Inmate denies injuries." [Record No. 53-7, p. 4].  The "Assessment" section of that same report states:

> Inmate denied any pain or injuries.  Upon visual assessment no injuries noted restraints able to place finger between cuff and inmates wrist. Good Circulation noted.  Positive pulses noted. Vital signs WNL [within normal limits]

*Id*.

Perry did not report to the medical staff that he was experiencing numbness and tingling in his right hand which he attributed to the wrist restraints until July 16, 2014 (over two weeks after the incident of June 27-28, 2014).  [Record No. 53-7, p. 9, "Subjective" complaint]  Perry filed this *Bivens* action on July 16, 2014.  He contends in his Response [Record No. 60] that Fowler and Sumner: (i) refused to provide him with medical treatment; (ii) delayed providing him with medical treatment; and (iii) were deliberately indifferent to his serious medical needs.  He further asserts that Nurse Sumner made false statements about the condition of his wrists in both the prison's official medical reports and in her Declaration filed in this action.

To determine if a plaintiff has a sufficiently serious medical need, courts have taken two nonexclusive paths.  A medical need is sufficiently serious if it is

"one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990) (citing *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987))).   Alternatively, a medical need is sufficiently serious if a plaintiff "place[s] verifying medical evidence in the record ... establish[ing] the detrimental effect of the delay in medical treatment." *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (quoting *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002)); *Blackmore*, 390 F.3d at 895 (citing *Napier*) ("*Napier* applies where the plaintiff's 'deliberate indifference' claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious.").

Perry presents no competent evidence as required by *Napier* showing that he suffered an injury that could objectively be considered as sufficiently serious under the case law that governs Eighth Amendment deliberate indifference claims. In his unsworn Response, he asserts his own subjective claims that he experienced pain, but he produced no independent medical proof to substantiate that he sustained a serious injury or suffered from a sufficiently serious condition under the Eighth Amendment.   Again, Perry broadly challenges the accuracy and truthfulness of the prisons' official two-hour lieutenant check records and its

-45-

related medical records, claiming that those records and Nurse Sumner's sworn Declaration were materially altered or fabricated, but he offers only speculation and his own self-serving conclusions.

The defendants have submitted properly authenticated official two-hour lieutenant check records documenting Perry's physical status during the time that he was held in restraints, and those records do not reflect that the lieutenants observed any problems that indicated medical treatment was needed. They also submit Perry's medical records showing that he did not complain of any problems related to his wrists or circulation until over two weeks, on July 16, 2014, the date on which Perry filed his *Bivens* complaint.

Contrary to the evidentiary requirements set forth in *Napier* which controls cases in which the plaintiff does not suffer from an obvious condition or injury, Perry has produced no medical evidence that his wrist restraints caused him to suffer or experience a serious medical need. Perry submits the affidavit of Joshua Meregildo, another federal prisoner, who states that on July 7, 2014 (more than a week after the events alleged in Perry's Complaint), he observed wounds on Perry wrists, and that on July 7, 2014, Perry told him that his wrist wounds were painful. [Record No. 60-1, p. 6, ¶ 5] Inmate Meregildo is not a medical professional qualified to express opinions regarding Perry's medical condition. Perry has produced no consultation or examination notes, or any other medical reports, suggesting that he suffered actual harm due to the alleged denial of medical treatment. And he certainly offers nothing to suggest that he currently suffers any

-46-

adverse medical effects caused by the restraints.   The only medical proof introduced into this record was submitted by the defendants, in the form of Nurse Sumner's Declaration and Perry's medical records attached thereto.

But even assuming that Perry experienced some minor irritation or temporary discomfort from the wrist restraints, that condition would be, at best, classified as a *de minimis* injury.   Prison medical and correctional staff constantly monitored Perry's wrist for any possible circulation impairment.   During this time, Perry did not express any complaints about his wrists or medical status.   Perry's claims are similar to those asserted by another prisoner in *Morva v. Johnson*, No. 7:09-CV-515, 2011 WL 2420650 (W.D. Va. Aug. 4, 2011).   In that action, the prisoner-plaintiff sued a city jail and its various officers, challenging his placement in a restraint chair and alleging that he suffered severe medical complications stemming from the episode.   The district court found no constitutional violation.[10]

---

[10] In *Morva*, the district court analyzed the plaintiff's medical claim, which stemmed from the application of wrist restraints, as follows:

> Furthermore, plaintiff did not experience anything more than a de minimis injury despite his allegation of "severe pain" from the reduced blood circulation…. The medical record shows that medical staff monitored plaintiff's circulation every thirty minutes between 2:20 p.m. and 10:20 p.m., and he did not complain about his restraints, circulation, or pain beyond back discomfort. Even during the night-shift before medical monitoring stopped, plaintiff does not allege he told anyone about the "severe pain" despite his ability to sing "very loudly." The alleged discomfort caused by the lack of circulation in his legs was temporary and a de minimis result. Accordingly, the defendants are entitled to qualified immunity because plaintiff fails to establish a constitutional violation and the unlawfulness of using the restraint chair was not objectively apparent at that time.

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(e), provides, in relevant part, that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury...." The physical injury required under § 1997e(e) for a claim under 42 U.S.C. § 1983 "need not be significant, but it must be more than *de minimis* for an Eighth Amendment claim to go forward." *Jarriett v. Wilson*, 162 F. App'x 394, 401 (6th Cir. 2005) (collecting cases). Thus, any discomfort, pain, or problem which Perry may have temporarily sustained was, at best, *de minimis*.

Even assuming that Perry has demonstrated the existence of a sufficiently serious medical need or condition which satisfies the objective prong of the Eighth Amendment's deliberate indifference analysis, he has nevertheless failed to satisfy the subjective prong of the analysis. Perry has not demonstrated that Fowler and Nurse Sumner were deliberately indifferent to, or maliciously and sadistically ignored his complaints about, his medical needs.

Perry's Eighth Amendment deliberate indifference claims against Fowler suffer a significant defect in that Fowler is not a medical professional. Fowler does not possess medical training. He is a correctional officer, not a medical provider. As a result, he relied on the medical staff to assess Perry's physical condition. [Record No. 53-5, pp. 2-3, ¶ 8]. Perry offers no proof to contradict

---

*Id.* at *7.

Fowler's statement that he is not a medical professional qualified to make medical decisions.

Based on his uncontroverted sworn statement, Fowler was entitled to rely on the judgment of medical professionals in the assessment and treatment of Perry's medical needs. *Harrison v. Ash.* 539 F.3d 510, 518 (6th Cir. 2008) (holding prison officials "were entitled to rely upon the medical treatment of CMS nurses once they obtained medical care for [the prisoner]."); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("As a nonmedical administrator, [the defendant] was entitled to defer to the judgment of jail health professionals as long as he did not ignore the plaintiff."); *Johnson v. Doughty*, 433 F.3d 1001, 1011–12 (7th Cir.2006) ("[a] nonmedical prison official ... cannot be held 'deliberately indifferent simply because [he] failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor."); *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004) ("If a prisoner is under the care of medical experts ... a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."). Summary judgment will be entered in Fowler's favor regarding Perry's Eighth Amendment claims alleging deliberate indifference to his medical needs.

Perry's Eighth Amendment deliberate indifference claims against Nurse Sumner also fail under the subjective prong of the deliberate indifference analysis. Again, the various official reports submitted by Fowler and Nurse Sumner document that: (1) both correctional officers (by lieutenants, every two-hours) and

-49-

the medical staff (twice during an eight hour shift) checked Perry's wrists according to the BOP's time-line requirements; (2) Nurse Sumner could place her finger between Perry's wrist and the restraint, which signaled no compromise or impairment to Perry's blood flow/circulation; (3) Perry manifested no objective signs of distress at any time between June 27-28, 2014; (4) Perry verbalized no complaints of pain or distress between June 27-28, 2014; (5) Perry's vital signs were within normal range while he remained in restraints between June 27-28, 2014; and (6) Perry did not report to the medical department complaining about his wrists/circulation issues until July 16, 2014, the date on which he filed his *Bivens* complaint. The Court rejects as insufficient Perry's bald, self-serving, and conclusory assertion [Record No. 60] that Nurse Sumner materially altered or falsified either her own sworn Declaration [Record No. 53-7, pp. 1-3] or the seven pages of authenticated records attached to it that document Perry's physical status and medical evaluations.

During the fourteen-hour period on June 27-28, 2014, Perry was properly evaluated and monitored by various USP-McCreary lieutenants and by Nurse Sumner. He was not denied medical treatment, and Nurse Sumner was not deliberately indifferent to his serious medical needs. *See McCullon*, No. 3:12-CV-445, 2013 WL 1192778, at *19 (M. D. Pa. Mar 4, 2013) (finding no deliberate indifference where restraints were employed for a limited amount of time due to the prisoner's violent behavior; prisoner's restraints and medical needs were

closely monitored between September 6-7, 2010; and the prison's medical staff observed no medical need to remove restraints).

Perry offers the affidavit of Inmate Meregildo who claims that on **July 7, 2014**, Nurse Sumner ignored Perry's medical complaints about his wrists and refused to provide Perry with any medical treatment.  [Record No. 60-1, pp. 5-6] Yet, in his Complaint filed on July 16, 2014 [Record No. 1], Perry did not allege that Nurse Sumner denied him medical treatment on **July 7, 2014**.  The only facts that Perry alleged in relation to Nurse Sumner were contained in his detailed version of the alleged events of **June 27-28, 2014**.  *See* Record No. 1, pp. 7-11, ¶¶ 48-82.  In paragraphs 79-80 of the Complaint, Perry described the alleged events of **June 28, 2014**, and his interactions on that date with Lt. Fowler and another USP-McCreary employees whom he identified as "Nurse Stevens."  [*Id*., p. 10, ¶¶ 79-80]  Still discussing the alleged events of **June 28, 2014**, Perry stated:

> **Later that day**, during PM SHU pill distribution, Inmate Perry showed Nurse Sumer [Sic] his wrists and complained of loss of feeling in his right wrists, but Nurse Sumer [sic] refused treatment and refused to give inmate a medical request form.

[*Id*. p. 10 ¶ 81 (emphasis in bold added)]

In his Complaint, Perry did allege that while he remained confined in the SHU between June 27, 2014, and July 4, 2014, several USP-McCreary officials denied him toilet paper, hygiene supplies, change of clothing and a shower.  [*Id*., p. 11, ¶ 83]  But Perry did not allege in his July 16, 2104, Complaint that Nurse Sumner denied him medical treatment on **July 7, 2014**.

Ignoring the glaring inconsistencies in Perry's allegations that Nurse Sumner was deliberately indifferent to his medical needs, Perry merely challenges the nature and extent of medical care which he received from Nurse Sumner. However, a prisoner's difference of opinion regarding diagnosis or treatment also does not rise to the level of an Eighth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Further, where a prisoner has received some medical attention but disputes the adequacy of that treatment, federal courts are reluctant to second-guess the medical judgments of prison officials and constitutionalize claims that sound in state tort law. *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976).

Finally, for a viable claim for the denial of medical care, the plaintiff must allege that his health suffered as a consequence of such alleged denial. *See Thaddeus–X v. Blatter*, 175 F.3d 378,401 (6th Cir. 1999). Perry offers no medical proof of any kind showing that any alleged delay in receiving medical treatment between June 27 and 28, 2014, worsened his alleged medical condition.

In his Response, Perry contends that summary judgment is not appropriate, alleging that he complied with the demand for a visual search prior to the application of calculated force; that he was in restraints for three days, from June 27-30, 2014, in violation of BOP policy; that the video surveillance tape will show that complained about pain and other problem in his wrists; and that in both the medical reports and her Declaration, Nurse Sumner made false statements about his physical condition while he remained in wrist restraints. Under 28 U.S.C. §

1746, unsworn declarations have the same force and effect as a sworn affidavit *only* if "subscribed by [the declarant], as true under penalty of perjury, and dated, in substantially the following form: ... 'I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature).' " 28 U.S.C. § 1746(2). *See Whiteside v. Collins*, No. 2:08-CV-875, 2012 WL 2374723, at *1 (S. D. Ohio June 22, 2012).

Perry's response does not contain such a subscription and, therefore, does not constitute a sworn affidavit under 28 U.S.C. § 1746(2). Thus, Perry has not submitted competent evidence that contradicts the defendants' sworn Declarations and authenticated records, either as to his failure to properly and fully exhaust his retaliation claims of May 1, 2014, or the events of June 27-28, 2014 (relative to Perry's claims of excessive force and deliberate indifference to his medical needs). Perry's unsupported and self-serving allegations are insufficient to defeat the defendants' motion for summary judgment supported by their sworn Declarations and authenticated records attached thereto. *See Garvey v. Montgomery*, 128 F. App'x 453, 462 n. 6 (6th Cir. 2005) (internal citations and quotation marks omitted) ("This court has noted that a motion for summary judgment may not be defeated by factual assertions in the brief of the party opposing it, since documents of this nature are self-serving and are not probative evidence of the existence or non-existence of any factual issues."); *Wolfe v. Village of Brice, Ohio*, 37 F.Supp.2d 1021, 1026 (S.D. Ohio 1999) (citing *Anderson* 477 U.S. at 251)

("[S]elf-serving affidavits, alone, are not enough to create an issue of fact sufficient to survive summary judgment.").

Perry did attach to his Response an affidavit in which he swore under oath that he wanted to obtain discovery, *i.e.*, audio and/or video surveillance and various documents including defendants' personnel files, in order to prove his case, and that he "had been denied opportunity for discovery prior to defendants' motion for summary judgment." [Record No. 60-1] Perry stated that he believed that the discovery he requested would prove that: (1) the prison staff knew about the defendant's propensity for "assaultive behavior and/or malicious and wanton infliction of pain on inmates;" (2) the defendants failed to follow BOP policy and/or that the prison's institutional supplements were inadequate; and (3) the defendants "were aware of and/or witnessed violation(s) of Plaintiff's Eighth Amendment rights and failed [] to intercede on behalf of Plaintiff/Inmate." [*Id.*, p. 2, ¶¶ 4-6]

A responding party may request additional discovery prior to a court granting summary judgment. Federal Rule of Civil Procedure 56(d) provides that if a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other order. Fed. R. Civ. P. 56(d).

The affidavit or declaration required by the rule must "indicate to the district court [the party's] need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000) (citing *Radich v. Goode*, 866 F.2d 1391, 1393–94 (3d Cir.1989). However, a request under Rule 56(d) may be properly denied where the requesting party "makes only general and conclusory statements regarding the need for more discovery," *Ball v. Union Carbide Corp.*, 385 F.3d 713, 720 (6th Cir. 2004) (citing *Ironside v. Simi Valley Hosp.*, 188 F.3d 350, 354 (6th Cir. 1999)), or where the affidavit "lacks 'any details' or 'specificity.'" *Id.* (quoting *Emmons v. McLaughlin*, 874 F.2d 351, 357 (6th Cir. 1989)). Denial of a Rule 56(d) motion has been affirmed when the parties were given insufficient time for discovery if "further discovery would not have changed the legal or factual deficiencies." *Maki v. Laakko*, 88 F.3d 361, 367 (6th Cir. 1996), *cert. denied*, 519 U.S. 1114 (1997). Finally, whether to grant a request for additional discovery falls within the trial court's discretion. *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 426 (6th Cir. 2009).

Here, Perry's affidavit lacks details or specificity regarding discovery that would contradict the defendants' argument that Perry failed to exhaust his administrative remedies as to his retaliation claims and that the use of calculated force on June 27, 2014, was necessary. Perry seeks only two specific items of discovery which he claims are needed to contest their motion: (1) audio and video footage of the use of force that was executed on June 27, 2014, to show that he

"made complaints of injuries on camera" and that the "restraints were not necessary and used as punishment;" and (2) disciplinary reports in defendants' personnel files which would "establish a propensity for assaultive behavior." [Id.]

The defendants correctly note that none of the items of discovery that Perry has requested would contradict the following: (1) Perry failed to administratively exhaust his retaliation claims between June 4-24, 2014, long before he was placed in the SHU on June 27, 2014; (2) Perry has failed to demonstrate he suffered an adverse action under a retaliation analysis; (3) Perry has not established Altizer used excessive force against him on June 27, 2014, or that that the calculated use of force applied to him on that date was excessive, given the defendants' perception of his poor attitude and Perry's prior  history of assaulting a prison guard; (4) any physical injury Perry sustained either while calculated force was being applied to him, or during the 14 hours after he was placed in restraints, was, at best *de minimis* and not sufficiently serious; (5) even if Perry's injuries were more than *de minimis*, the defendants were not deliberately indifferent to any medical needs because they closely monitored Perry's wrists between June 27-28, 2014; Perry did not complain of any injuries during that time-fame; and they found no medically objective reasons to remove the restraints or to administer any medical treatment to Perry.  Thus, in the exercise of its discretion, the Court determines that the discovery which Perry requests would not change the legal and factual deficiencies of his case.

## 5. Assault Claim (State Tort Claim)/FTCA Claim Against Lt. Altizer

Perry may not proceed with a state law tort claim against Altizer for alleged assault. A *Bivens* civil rights action is the mechanism which enables a plaintiff to sue a federal official who has allegedly violated the plaintiff's federal constitutional rights. Having dismissed all of Perry's claims which implicate federal question jurisdiction, this Court declines to exercise jurisdiction over any state law claims asserted by Perry. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966); *Washington v. Starke*, 855 F.2d 346, 351 (6th Cir. 1988) ("It is a clear rule of this circuit that if a plaintiff has not stated a federal claim, his pendant state law claims should be dismissed.").

Further, to the extent that the defendants treat Perry's assault claim against Altizer claim as one falling under the FTCA, they correctly argue that any FTCA claim is barred. When a tort claim is brought against a federal employee, the Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the "Westfall Act", applies. *See* Pub. L. No. 100–694, §§ 5–6, 102 Stat. 4563 (1988). The Westfall Act "empowers the Attorney General to certify that the employee was acting within the scope of his office or employment at the time of the incident ..." giving rise to the claim. *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995) (quoting 28 U.S.C. § 2679(d)(1)). [11]

---

[11]  In their Memorandum, the defendants state "[b]ecause Defendant Altizer was acting within the scope of his employment at all times relating to Plaintiff's claims, Plaintiff's state tort law claims against Altizer must be dismissed." [Record No. 53-1, p. 24] It is

Upon certification, the United States is substituted for the employee as a defendant, and the claim is litigated under the FTCA and is subject to dismissal on any basis applicable to FTCA claims. *See* 28 U.S.C. § 2679(d)(4) (providing that the claims "shall be subject to the limitations and exceptions applicable to those [FTCA] actions"); *Dolan v. United States*, 514 F.3d 587, 593 (6th Cir. 2008) ("[I]f the defendant federal employee was acting in the scope of his or her employment, substitution of the United States as defendant is appropriate and the district court must assess the plaintiff's claims pursuant to the [FTCA] ... the case must be dismissed for lack of jurisdiction."); *see also United States v. Smith*, 499 U.S. 160, 166 (1991) ("[T]he FTCA [is] the exclusive mode of recovery for the tort of a Government employee even when the FTCA itself precludes Government liability."). Any suit against the employee "arising out of or related to the same subject matter" is precluded. 28 U.S.C. § 2679(b)(1), because the statute effectively "shields federal employees from liability for common law torts committed within the scope of employment." *Sullivan III v. Shimp*, 324 F.3d 397, 399 (6th Cir. 2003). Perry's state law tort claim of assault against Altizer is therefore subject to dismissal because § 2679(b)(1) immunizes Altizer from such a claim. *See Hui v. Castaneda*, 559 U.S. 799, 805-07 (2010); *Rector v. United States*, 243 F. App'x 976, 978-79 (6th Cir. 2007); *Dickson v. Wojcik*, 22 F. Supp. 3d 830, 835-36 (W.D. Mich. 2014).

---

unclear when or where the Attorney General's certification was filed, but the Court has concluded that Altizer and the other defendants have demonstrated that the use calculated force against Perry on June 27, 2014, was justified and necessary.

Further the defendants correctly argue that, to the extent that his assault claim falls under the FTCA, Perry cannot proceed with the claim because he did not submit an FTCA *administrative* claim concerning the alleged assault of June 27, 2014.  In his Declaration dated July 20, 2015, Billings states under oath that Perry has submitted no FTCA administrative claim alleging that Altizer assaulted him on June 27, 2014.  [Record No, 53-2. P. 5, ¶ 12]  And Perry offers no competent evidence to contradict Billings's sworn Declaration.  Under 28 U.S.C. § 2675(a), "[a]n action shall not be instituted upon a claim against the United States for money damages for injury… unless the claimant shall have first presented the claim to the appropriate federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail."  28 U.S.C. § 2675(a).  Suits filed prior to the completion of the FTCA administrative process must be dismissed as premature.  *McNeil v. United States*, 508 U.S. 106, 111-13 (1993); *Cf. Solis-Caceres v. United States*, No. 13-120-DLB, 2014 WL 1612693, at *2 (E.D. Ky. Apr. 22, 2014) Accordingly, Perry's state law claim alleging assault against Lt. Altizer will be dismissed for lack of subject-matter jurisdiction.

## V.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

(1)     The "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" filed by Defendants Leroy Chaney, Lieutenant at the USP-McCreary,

Defendant Donald Weiss, Lieutenant at the USP-McCreary, Defendant John Fowler, Lieutenant at the USP-McCreary, Defendant David Altizer, Lieutenant at the USP-McCreary, and Defendant Stephanie Sumner, Nurse at the USP-McCreary [Record No. 53] is **GRANTED**.

(2)     This action is **DISMISSED**, with prejudice, and **STRICKEN** from the Court's docket.

This 29th day of February, 2016.

**Signed By:**

**_Danny C. Reeves_**

**United States District Judge**